**No. 26-1151**

**IN THE
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

SCARLETT PAVLOVICH,
Plaintiff-Appellant,

v.

AMANDA PALMER,
Defendant-Appellee.

---

**APPENDIX OF APPELLANT SCARLETT PAVLOVICH**

On Appeal from the United States District Court
for the District of Massachusetts
Civil Action No. 25-10263-NMG

---

Lane A. Haygood
Kamerman, Uncyk, Soniker & Klein, P.C.
1700 Broadway
New York, NY 10019
(212) 400-4930
lhaygood@kusklaw.com

Attorney for Plaintiff-Appellant Scarlett Pavlovich

**TABLE OF CONTENTS OF APPENDIX**

1.  Relevant Docket Entries ..................................................................................... A-1

2.  Complaint........................................................................................................... A-4

3.  Memorandum & Order ....................................................................................A-30

4.  Final Order of Dismissal................................................................................A-43

**RELEVANT DOCKET ENTRIES**

Case: 26-1151    Document: 00118433328    Page: 4    Date Filed: 04/16/2026    Entry ID: 6802606

APPEAL

# United States District Court
## District of Massachusetts (Boston)
### CIVIL DOCKET FOR CASE #: 1:25-cv-10263-NMG

Pavlovich v. Palmer
Assigned to: Judge Nathaniel M. Gorton
Case in other court: USCA - First Circuit, 26-01151
Cause: 28:1331 Fed. Question

Date Filed: 02/03/2025
Date Terminated: 02/06/2026
Jury Demand: Plaintiff
Nature of Suit: 890 Other Statutory Actions
Jurisdiction: Federal Question

**Plaintiff**

**Scarlett Pavlovich**                        represented by   **Michael Nimmo**
Wahlberg, Woodruff, Nimmo & Sloane, LLP
4601 DTC Boulevard, Ste. 950
Denver, CO 80237
303-571-1806
Email: mnimmo@wagstafflawfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Mitchell J. Matorin**
Matorin Law Office LLC
Suite 5
18 Grove Street
Wellesley, MA 02482
781-453-0100
Fax: 888-628-6746
Email: mmatorin@matorinlawoffice.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Amanda Palmer**                        represented by   **Daniel N. Marx**
Fick & Marx LLP
24 Federal Street, 4th Flr.
Boston, MA 02110
857-321-8360
Email: dmarx@fickmarx.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**William W. Fick**
Fick & Marx LLP
24 Federal Street, 4th Flr.
Boston, MA 02110
857-321-8360
Email: wfick@fickmarx.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/03/2025 | 1 | COMPLAINT against All Defendants Filing fee: $ 405, receipt number AMADC-10820253 (Fee Status: Filing Fee paid), filed by Scarlett Pavlovich. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Category Sheet)(Matorin, Mitchell) (Entered: 02/03/2025) |
| 02/03/2025 | 2 | DEMAND for Trial by Jury by Scarlett Pavlovich. (Matorin, Mitchell) (Entered: 02/03/2025) |
| 02/04/2025 | 3 | ELECTRONIC NOTICE of Case Assignment. Judge Nathaniel M. Gorton assigned to case. If the trial Judge issues an Order of Reference of any matter in this case to a Magistrate Judge, the matter will be transmitted to Magistrate Judge Donald L. Cabell. (SEC) (Entered: 02/04/2025) |
| 02/04/2025 | 4 | Summons Issued as to Amanda Palmer. **Counsel receiving this notice electronically should download this summons, complete one for each defendant and serve it in accordance with Fed.R.Civ.P. 4 and LR 4.1. Summons will be mailed to plaintiff(s) not receiving notice electronically for completion of service.** (JAM) (Entered: 02/04/2025) |
| 03/13/2025 | 5 | NOTICE of Appearance by William W. Fick on behalf of Amanda Palmer (Fick, William) (Entered: 03/13/2025) |

A-1

| | | |
|---|---|---|
| 03/13/2025 | 6 | NOTICE of Appearance by Daniel N. Marx on behalf of Amanda Palmer (Marx, Daniel) (Entered: 03/13/2025) |
| 03/18/2025 | 7 | Assented to MOTION for Extension of Time to April 21, 2025 to File Answer *or Other Responsive Pleading* by Amanda Palmer. (Fick, William) (Entered: 03/18/2025) |
| 03/19/2025 | 8 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 7 Motion for Extension of Time to Answer re 1 Complaint. Amanda Palmer answer due 4/21/2025. (NMC) (Entered: 03/19/2025) |
| 04/01/2025 | 9 | AFFIDAVIT OF SERVICE Executed by Scarlett Pavlovich. Amanda Palmer served on 2/27/2025, answer due 4/21/2025. Acknowledgement filed by Scarlett Pavlovich. (Matorin, Mitchell) (Entered: 04/01/2025) |
| 04/02/2025 | 10 | Assented to MOTION for Leave to Appear Pro Hac Vice for admission of Akiva Cohen, Lane Haygood, Thomas Neville, Dylan Schmeyer, and Michael Nimmo Filing fee: $ 625, receipt number AMADC-10929020 by Scarlett Pavlovich. (Attachments: # 1 Affidavit Declaration of Akiva Cohen in Support of PHV, # 2 Affidavit Declaration of Lane Haygood in Support of PHV, # 3 Affidavit Declaration of Thomas Neville in Support of PHV, # 4 Affidavit Declaration of Dylan Schmeyer in Support of PHV, # 5 Affidavit Declaration of Michael Nimmo in Support of PHV)(Matorin, Mitchell) (Entered: 04/02/2025) |
| 04/03/2025 | 11 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 10 Motion for Leave to Appear Pro Hac Vice Added Akiva Cohen, Lane Haygood, Thomas Neville, Dylan Schmeyer, and Michael Nimmo.<br><br>**Attorneys admitted Pro Hac Vice must have an individual PACER account, not a shared firm account, to electronically file in the District of Massachusetts. To register for a PACER account, go the Pacer website at https://pacer.uscourts.gov/register-account. You must put the docket number under ADDITIONAL FILER INFORMATION on your form when registering or it will be rejected.**<br><br>Pro Hac Vice Admission Request Instructions https://www.mad.uscourts.gov/caseinfo/nextgen-pro-hac-vice.htm.<br><br>A Notice of Appearance must be entered on the docket by the newly admitted attorney.<br><br>(NMC) (Entered: 04/03/2025) |
| 04/21/2025 | 12 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Amanda Palmer.(Marx, Daniel) (Entered: 04/21/2025) |
| 04/21/2025 | 13 | MEMORANDUM in Support re 12 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Amanda Palmer. (Marx, Daniel) (Entered: 04/21/2025) |
| 04/21/2025 | 14 | MOTION to Dismiss *Counts 1 through 4 of Complaint because TVPA does not apply extraterritorially to alleged conduct in New Zealand* by Amanda Palmer.(Marx, Daniel) (Entered: 04/21/2025) |
| 04/21/2025 | 15 | MEMORANDUM in Support re 14 MOTION to Dismiss *Counts 1 through 4 of Complaint because TVPA does not apply extraterritorially to alleged conduct in New Zealand* filed by Amanda Palmer. (Marx, Daniel) (Entered: 04/21/2025) |
| 04/21/2025 | 16 | MOTION to Dismiss *on basis of forum non conveniens* by Amanda Palmer.(Marx, Daniel) (Entered: 04/21/2025) |
| 04/21/2025 | 17 | MEMORANDUM in Support re 16 MOTION to Dismiss *on basis of forum non conveniens* filed by Amanda Palmer. (Attachments: # 1 Exhibit A)(Marx, Daniel) (Entered: 04/21/2025) |
| 04/30/2025 | 18 | MOTION for Extension of Time to June 4, 2025 to File *Oppositions to Three Motions to Dismiss* by Scarlett Pavlovich.(Matorin, Mitchell) (Entered: 04/30/2025) |
| 05/01/2025 | 19 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 18 MOTION for Extension of Time to June 4, 2025 to File *Oppositions to Three Motions to Dismiss*. Oppositions due by 6/4/2025. (NMC) (Entered: 05/01/2025) |
| 05/22/2025 | 20 | NOTICE of Appearance by Michael Nimmo on behalf of Scarlett Pavlovich (Nimmo, Michael) (Entered: 05/22/2025) |
| 06/04/2025 | 21 | MEMORANDUM in Opposition re 14 MOTION to Dismiss *Counts 1 through 4 of Complaint because TVPA does not apply extraterritorially to alleged conduct in New Zealand* filed by Scarlett Pavlovich. (Matorin, Mitchell) (Entered: 06/04/2025) |
| 06/04/2025 | 22 | MEMORANDUM in Opposition re 16 MOTION to Dismiss *on basis of forum non conveniens* filed by Scarlett Pavlovich. (Attachments: # 1 Affidavit Declaration of Dylan Schmeyer in Support of Opposition to Motion to Dismiss)(Matorin, Mitchell) (Entered: 06/04/2025) |
| 06/04/2025 | 23 | MEMORANDUM in Opposition re 12 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Scarlett Pavlovich. (Matorin, Mitchell) (Entered: 06/04/2025) |
| 06/25/2025 | 24 | MOTION for Leave to File *Replies in Support of Motions to Dismiss* by Amanda Palmer. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Marx, Daniel) (Entered: 06/25/2025) |
| 06/26/2025 | 25 | Judge Nathaniel M. Gorton: ELECTRONIC ORDER entered **ALLOWING** 24 Motion for Leave to File Document ; Counsel using the Electronic Case Filing System should now file the document for which leave to file has been granted in accordance with the CM/ECF Administrative Procedures. Counsel must include - Leave to file granted on (date of order)- in the caption of the document. (NMC) (Entered: 06/26/2025) |
| 06/26/2025 | 26 | REPLY to Response to 12 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM filed by Amanda Palmer. (Marx, Daniel) (Entered: 06/26/2025) |
| 06/26/2025 | 27 | REPLY to Response to 14 MOTION to Dismiss *Counts 1 through 4 of Complaint because TVPA does not apply extraterritorially to alleged conduct in New Zealand* filed by Amanda Palmer. (Marx, Daniel) (Entered: 06/26/2025) |
| 06/26/2025 | 28 | REPLY to Response to 16 MOTION to Dismiss *on basis of forum non conveniens* filed by Amanda Palmer. (Attachments: # 1 Exhibit A)(Marx, Daniel) (Entered: 06/26/2025) |

A-2

| 10/03/2025 | 29 | Notice of Supplemental Authorities re 16 MOTION to Dismiss *on basis of forum non conveniens* (Attachments: # 1 Exhibit A) (Marx, Daniel) (Entered: 10/03/2025) |
| 12/11/2025 | 30 | Notice of Supplemental Authorities re 12 MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM (Marx, Daniel) (Entered: 12/11/2025) |
| 12/26/2025 | 31 | Response by Scarlett Pavlovich to 30 Notice of Supplemental Authorities . (Matorin, Mitchell) (Entered: 12/26/2025) |
| 02/06/2026 | 32 | Judge Nathaniel M. Gorton: ORDER entered. MEMORANDUM AND ORDER. For the foregoing reasons, the motion to dismiss for forum non conveniens is **ALLOWED**.<br><br>**So Ordered.**<br><br>(NMC) (Entered: 02/09/2026) |
| 02/06/2026 | 33 | Judge Nathaniel M. Gorton: ORDER entered. ORDER DISMISSING CASE. (NMC) (Entered: 02/09/2026) |
| 02/11/2026 | 34 | NOTICE OF APPEAL as to 32 Memorandum & ORDER, 33 Order Dismissing Case by Scarlett Pavlovich. Filing fee: $ 605, receipt number AMADC-11544661 Fee Status: Not Exempt.<br><br>NOTICE TO COUNSEL: A Transcript Report/Order Form, which can be downloaded from the First Circuit Court of Appeals web site at http://www.ca1.uscourts.gov MUST be completed and submitted to the Court of Appeals. **Counsel shall register for a First Circuit CM/ECF Appellate Filer Account at http://pacer.psc.uscourts.gov/cmecf. Counsel shall also review the First Circuit requirements for electronic filing by visiting the CM/ECF Information section at http://www.ca1.uscourts.gov/cmecf. US District Court Clerk to deliver official record to Court of Appeals by 3/3/2026.** (Haygood, Lane) (Entered: 02/11/2026) |
| 02/12/2026 | 35 | Certified and Transmitted Abbreviated Electronic Record on Appeal to US Court of Appeals re 34 Notice of Appeal. (MAP) (Entered: 02/12/2026) |
| 02/12/2026 | 36 | USCA Case Number 26-1151 for 34 Notice of Appeal, filed by Scarlett Pavlovich. (MAP) (Entered: 02/12/2026) |

| **PACER Service Center** | | |
| --- | --- | --- |
| **Transaction Receipt** | | |
| 04/14/2026 23:57:41 | | |
| **PACER Login:** | haygoodlawfirm | **Client Code:** | Pavlovich |
| **Description:** | Docket Report | **Search Criteria:** | 1:25-cv-10263-NMG |
| **Billable Pages:** | 4 | **Cost:** | 0.40 |

A-3

# COMPLAINT

## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SCARLETT PAVLOVICH,

                        Plaintiff,

           -against-

AMANDA PALMER,

                    Defendant.

C.A. NO. 1:25-CV-10263F

Plaintiff, by and through her undersigned counsel, respectfully alleges as follows:

## COMPLAINT

1. This claim arises out of Neil Gaiman's sexual abuse of Plaintiff, and his wife Amanda Palmer's role in procuring and presenting Plaintiff to Gaiman for such abuse.

2. The facts pled in this Complaint are of a highly sensitive nature, detailing sexual assault and abuse, and may be upsetting to some readers.

## PARTIES

3. Plaintiff Scarlett Pavlovich is a citizen of New Zealand currently residing in Scotland.

4. Defendant Amanda Palmer is either a citizen of the State of New York, residing in New York, or a citizen of the State of Massachusetts, residing in Lexington.

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that it raises claims under the Trafficking Victim Protection Act, 18 U.S.C. §§ 1581 *et seq*.

1

A-4

6.    The Court has jurisdiction over Scarlett's non-statutory claims pursuant to 28 U.S.C. § 1367(a), in that those claims are so related to Scarlett's statutory claims that they form part of the same case or controversy under Article III of the United States Constitution

7.    Venue in this Court is appropriate in that 18 U.S.C § 1595 authorizes Scarlett to bring a civil action in any appropriate United States District Court, and 18 U.S.C. § 1391(b)(3) permits a civil action to be brought in "any judicial district in which any defendant is subject to the court's personal jurisdiction to such action."

8.    Upon information and belief, jurisdiction over Palmer is appropriate in either New York or Massachusetts, and Palmer may consent to jurisdiction in Wisconsin. Given the uncertainty regarding Palmer's state of residence, Plaintiff is simultaneously filing actions against Palmer in the United States District Courts for the Southern District of New York and the District of Massachusetts. Scarlett has also filed an action against Gaiman in the Western District of Wisconsin and has named Palmer as a Defendant in that action to allow Palmer to consent to jurisdiction there, if she prefers to litigate Scarlett's claims with Gaiman as a co-Defendant. Scarlett will proceed against Palmer only in the district of her choosing.

### FACTS

9.    Gaiman has a decades-long history of sexual misconduct consistent with the actions that will be described in the following paragraphs.

10.    This misconduct includes sexual contact with multiple women who have not consented to his actions.

11.    In cases where his victims submitted to sexual contact with Gaiman, his actions have often exceeded any consent that might have been granted.

12.    Gaiman's misconduct has spanned decades, commencing no later than 2007.

2

A-5

13.    In an effort to conceal his misconduct, Gaiman has entered into several agreements to provide compensation to women he has victimized, in some cases for hundreds of thousands of dollars.

14.    Palmer either is or was Gaiman's wife.

15.    Since at least 2015, Palmer has been aware of Gaiman's pattern of sexual misconduct.

16.    Gaiman and Palmer separated in 2020 and have been locked in a divorce and custody battle since.

17.    Gaiman and Palmer have a child.

**A.    Palmer Targets Scarlett**

18.    Scarlett met Palmer in Auckland, New Zealand, in 2020.

19.    Scarlett met Palmer in and around the time of the COVID pandemic outbreak.

20.    At the time, Scarlett was 22 years old.

21.    The two became acquaintances.

22.    Scarlett would occasionally visit Palmer at Palmer's house on Waiheke Island, sometimes for planned events.

23.    Waiheke is an island located 16 miles from Auckland's central business district.

24.    Waiheke is only accessible from Auckland via a forty-minute ferry ride.

25.    That ferry costs over $40 NZD at its cheapest and up to $59 NZD to ride at peak times.

26.    Scarlett would sometimes do personal tasks for Palmer, such as running errands, babysitting, or helping with household chores.

27.    Scarlett was generally not paid for these tasks.

28.    Scarlett was economically insecure during this time.

29. Scarlett had recently been unhoused and sleeping on the beach.

30. Palmer was aware that Scarlett was economically insecure.

31. Scarlett had also coped with substantial mental health difficulties over the years.

32. Scarlett, who is a lesbian, was sexually assaulted by a 45-year-old man when she was 15 years old.

33. Scarlett's more recent mental health challenges included significant anxiety related to her increasingly insecure housing situation.

34. Palmer was aware that Scarlett had been suffering from mental health difficulties.

35. Scarlett had discussed her mental health with Palmer at various times after the two became acquaintances.

**B.    A Promise of Employment**

36. On February 1, 2022, Palmer asked Scarlett if Scarlett could babysit for the weekend.

37. At the time, Palmer and Gaiman were separated and living in homes that were near each other, on Waiheke Island.

38. Waiheke Island is an island near Auckland, New Zealand that many wealthy people favor as a residence because it is remote and difficult to access.

39. Because Palmer and Gaiman lived in separate homes, babysitting for Palmer and Gaiman's child would entail spending time at both houses.

40. Palmer promised Scarlett would be paid for doing this work.

41. Scarlett agreed.

42. On the afternoon of February 4, 2022, Scarlett arrived at Gaiman's house to babysit for Gaiman and Palmer's child.

43. Scarlett spent an hour with the child.

4

44. Gaiman then changed the plan for the evening.

45. Gaiman decided that he would drop the child off at a friend's home and the child would later be returned to his house where Scarlett would watch the child.

46. Palmer had purchased tickets for a film that evening, intending to go with Gaiman after the child had been dropped off at the playdate. Instead, she stayed in Auckland and suggested that Gaiman take Scarlett to the film after dropping the child off.

**C.    Gaiman Rapes Scarlett for the First Time**

47. While waiting for the child's return, Gaiman gave Scarlett a tour of the grounds, pointing out features such as a bathtub in the garden and a fig tree, and picking a fig for Scarlett.

48. Gaiman and Scarlett had dinner together that evening.

49. The child was still at the home of the family friend.

50. Gaiman provided Scarlett with wine but drank no alcohol himself.

51. After dinner, Gaiman suggested that Scarlett bathe in the bathtub in the garden.

52. Scarlett was initially unwilling to do so.

53. Gaiman persisted in his suggestions and grew more insistent.

54. Scarlett eventually agreed after Gaiman told her that he had to make a work call.

55. Upon information and belief, there was no work call.

56. Shortly after Scarlett began to bathe, Gaiman arrived unannounced.

57. And naked.

58. Gaiman got into the bathtub with Scarlett.

59. Without being invited to do so.

60. Scarlett was shocked and frightened by Gaiman's behavior.

61. At that time Gaiman was 61 years old.

62. Gaiman is significantly physically larger than Scarlett.

63. Scarlett pulled her knees to her chest and curled her arms around them.

64. Shortly after getting into the bathtub with Scarlett, Gaiman instructed her to stretch out.

65. Scarlett was reluctant and expressed her reluctance.

66. Gaiman repeated his command that she stretch out.

67. Scarlett eventually stretched out.

68. Gaiman began to stroke Scarlett's feet.

69. Gaiman instructed Scarlett to come to his side of the tub, where "the view was better."

70. Scarlett objected but eventually complied.

71. Gaiman pulled Scarlett into his lap.

72. Gaiman then penetrated Scarlett's rectum with his fingers.

73. Scarlett objected.

74. Gaiman also attempted to penetrate Scarlett's rectum with his penis.

75. Scarlett objected.

76. Gaiman asked to rub his penis on Scarlett's breasts.

77. Scarlett objected.

78. Gaiman asked Scarlett if he could ejaculate on Scarlett's face.

79. Scarlett said no.

80. Gaiman ejaculated on Scarlett's face.

81. Gaiman instructed Scarlett to call him "Master."

82. Gaiman called Scarlett a "good little girl."

83. Scarlett attempted to clean herself in the water.

84.     Gaiman watched.

85.     While watching, Gaiman said words to the effect of "Amanda told me I couldn't have you."

86.     Gaiman also said that as soon as Amanda said he could not have Scarlett, he knew he had to have Scarlett.

87.     Palmer had told Gaiman that Gaiman could not have "this one."

88.     Palmer had told Gaiman of Scarlett's mental health challenges.

89.     Palmer had specifically informed Gaiman that Gaiman would seriously harm Scarlett if he abused her.

90.     Palmer told Gaiman this because Palmer knew about Gaiman's history of sexual misconduct.

91.     Palmer also told Gaiman this because Palmer knew about Gaiman's sexual predilections and need to humiliate his female sexual partners – with or without their consent.

92.     Palmer also knew that Scarlett was an abuse survivor who had suffered mental health challenges in the remote and recent past.

93.     Palmer was clearly aware of the danger that Gaiman posed to Scarlett.

94.     Palmer said nothing to Scarlett about her concerns about what Gaiman would do.

95.     Palmer said nothing to Scarlett about her knowledge of Gaiman's prior sexual misconduct.

96.     Palmer said nothing to Scarlett about Gaiman's need to humiliate and degrade his female sexual partners because, as he put it, it was the only way he could "get off."

97.     Palmer either knew or should have known that telling Gaiman he couldn't "have" Scarlett would fuel Gaiman's desire to "have" Scarlett as a sexual partner.

98.    Regardless of Scarlett's desire or consent.

99.    Palmer, in other words, either knew or should have known that she was marking Scarlett as prey in Gaiman's eyes.

100.    After the incident, Scarlett retreated to Palmer's house.

101.    That night had been Scarlett's first real physical contact with Gaiman.

102.    Until then, she was familiar only with his carefully cultivated reputation as a "feminist" who trusted – and could be trusted by – women.

103.    Scarlett could not sleep.

104.    She stayed up, searching the Internet for "Neil Gaiman MeToo," trying to reconcile what Gaiman had done to her with his reputation.

105.    Scarlett was looking for any information that would suggest that she was not Gaiman's first victim.

106.    She did not find any.

107.    Gaiman had bound previous victims with non-disclosure agreements when he settled their claims against him.

### D.    After the First Sexual Assault

108.    Scarlett completed the weekend of babysitting.

109.    But she was not immediately paid.

110.    Or for months thereafter.

111.    After the weekend, Palmer, acting for herself and Gaiman, formally offered Scarlett a job as a live-in nanny.

112.    Scarlett, who was housing insecure at the time, was desperate for secure employment and affordable housing.

113.    She was not getting enough hours at her current job.

114. Her lease was about to run out.

115. She had been unable to find a new apartment she could afford.

116. Palmer encouraged Scarlett to give up her prior job and housing to accept the role as live-in nanny.

117. Gaiman promised Scarlett he would use his tremendous industry influence to promote her writing career.

118. Scarlett accepted the job.

119. The job required her to care for the child at both Palmer and Gaiman's houses.

120. Palmer and Gaiman promised that Scarlett would be paid for the work.

121. But Palmer and Gaiman did not pay Scarlett for the work.

122. She was, in effect, an economic hostage to Palmer and Gaiman.

123. During the time that Scarlett was working without pay, Gaiman repeatedly raped Scarlett.

124. During the time that Scarlett was working without pay, Gaiman repeatedly sexually assaulted Scarlett.

125. One rape occurred on February 14, 2022, and involved Gaiman forcing anal sex on Scarlett while smearing her with truffle oil.

126. Gaiman knew that he was raping Scarlett.

127. Scarlett screamed "I can't" and "no" at the start of the encounter.

128. And continued to scream in pain through the entire encounter.

129. At the conclusion of the anal sex, Gaiman ordered Scarlett to clean him up.

130. With her tongue.

131. Scarlett objected that it was unhygienic.

132.   Gaiman insisted.

133.   Gaiman said "don't make your master angry!"

134.   Scarlett then complied with Gaiman's order.

135.   Gaiman referred to the assault as a "Valentine's Day present."

136.   During another incident, Scarlett experienced severe pain during Gaiman's forcible sodomy.

137.   The pain was so overwhelming that Scarlett saw stars and lost consciousness.

138.   Scarlett later described the pain as "celestial" and "cosmic", because it caused stars to explode in her vision.

139.   Gaiman made no attempt to aid Scarlett.

140.   When she came to, Gaiman was watching videos of rehearsals for one of his television shows.

141.   As she bled from the anus.

142.   In yet another incident, Scarlett was bleeding and objecting after Gaiman forced himself on her.

143.   Gaiman told Scarlett that she needed to be punished.

144.   Gaiman then proceeded to punish her.

145.   By choking her with his belt.

146.   And by striking her with his belt.

147.   On her backside.

148.   And on her vagina.

149.   In another incident, Gaiman forced his penis inside Scarlett's mouth with such force that Scarlett vomited.

10

A-13

150. Gaiman ordered Scarlett to clean up her own vomit.

151. By licking it off his lap and off the couch.

152. When Gaiman anally raped her that night he used butter, not truffle oil.

153. And in another incident, he did it again.

154. Some incidents took place in the presence of Gaiman and Palmer's child.

155. On February 19, 2022, Gaiman and his child stayed in an Auckland hotel room.

156. Scarlett came over to watch the child

157. All three were present: Gaiman's child, playing with his iPad, Scarlett on the edge of the bed, Gaiman.

158. Gaiman pulled Scarlett to him and covered them with bedding.

159. Scarlett tried to get him to stop, mouthing "what the fuck are you doing?"

160. Gaiman did not stop.

161. Gaiman vaginally penetrated Scarlett from behind.

162. While still talking to his child.

163. While Scarlett buried her face in shame and pain.

164. In an effort to avoid alerting the child.

165. This continued for about five minutes.

166. Gaiman then went to the bathroom.

167. While in the bathroom, Gaiman covered his hand with urine.

168. He returned to the bed.

169. And wiped his hand on Scarlett's face and mouth, telling her that it was a "present" and ordering her to "lick it off."

170. Gaiman returned to the bathroom.

11

171.    He ordered Scarlett to "finish [her] job."

172.    Scarlett entered the bathroom.

173.    Gaiman pushed Scarlett to her knees.

174.    Scarlett understood that Gaiman wanted her to perform oral sex on him.

175.    Gaiman put his penis in Scarlett's mouth.

176.    With the door open.

177.    Scarlett did not resist.

178.    Throughout this period, Scarlett was not paid.

179.    Gaiman and Palmer knowingly benefitted (financially and otherwise).

180.    Gaiman received free sexual services and labor from Scarlett.

181.    Palmer aided and abetted Gaiman's violations by providing knowing and substantial assistance to Gaiman when she knew or should have known that Scarlett was being subject to forced sexual acts through means of actual force or threats of force and that she and Gaiman were receiving free labor from her.

182.    Throughout this period, Gaiman ordered Scarlett to call him "master."

183.    Throughout this period, Gaiman would frequently refer to Scarlett as "slave."

184.    This happened so often that the child began to order Scarlett to call the child "master."

185.    The child began to call Scarlett "slave."

186.    Gaiman understood that Scarlett was not willingly participating in sexual activities with him.

187.    Gaiman understood that Scarlett did not consent to sexual activity.

188.    Gaiman did not mistakenly believe that Scarlett consented.

12

A-15

189. Gaiman knew that he had previously gone beyond any consent provided by his many sexual partners.

190. He knew this because prior partners had told him so.

191. He also knew that his misconduct, breaches of trust, and nonconsensual sexual conduct caused his partners lasting harm.

192. He knew this because prior partners had told him so.

193. And he had responded by compensating them for the harm he caused.

194. But only after they signed nondisclosure agreements to protect his reputation as a self-declared feminist.

195. Gaiman showed no concern for Scarlett's state of mind or consent during the time Scarlett was kept as the child's nanny.

196. Scarlett knew that she had only two choices: she could either submit to Gaiman's coercion and violence or she could try to escape.

197. She had nowhere to go.

198. She had no other residence.

199. She had no other job.

200. She had not been paid.

201. She knew almost nobody on Waiheke but Gaiman and Palmer's friends.

202. She was broke and homeless.

203. Palmer and Gaiman knew that Scarlett was penniless and homeless.

204. Scarlett could not afford housing.

205. Scarlett could not easily afford transport off the island.

206. Scarlett could not even easily afford food.

13

207. Gaiman and Palmer did not forget to pay Scarlett.

208. Gaiman and Palmer intentionally withheld Scarlett's pay.

209. Gaiman and Palmer intended to have Scarlett trapped, vulnerable, and penniless.

210. Because that would leave her without a real chance to defend herself or escape.

211. It worked.

**E.    Gaiman And Palmer Discard Scarlett**

212. Weeks after Scarlett began working as Gaiman and Palmer's nanny, Gaiman and the child left for Europe.

213. Scarlett went to Palmer and told Palmer much of what Gaiman had been doing to her.

214. Palmer expressed no surprise.

215. Because Palmer was not surprised.

216. Palmer said "I bet he did."

217. Palmer told Scarlett – for the first time – more than a dozen women, including several former employees, had previously come to Palmer about abusive sexual encounters with Gaiman.

218. Palmer told Scarlett some of those women had reported disturbing experiences.

219. Palmer had told Scarlett none of this previously.

220. Had Palmer told Scarlett this, Scarlett would not have accepted the job.

221. Palmer said she would "take care" of Scarlett.

222. And that she had done so before for other women.

223. Taking care of Scarlett did not involve paying her.

224. It did involve procuring temporary accommodation for Scarlett in Auckland.

225. But this was not intended to help Scarlett escape.

14

226. It was so that Scarlett would be available when Gaiman and the child returned to New Zealand.

227. Or if they decided to ship Scarlett to the UK to be with Gaiman and the child.

228. While living in temporary accommodation, Scarlett became suicidal.

229. Scarlett told Palmer of her plan to commit suicide.

230. Scarlett was put in a psychiatric respite center to treat her suicidal ideation.

231. While Scarlett was hospitalized, Palmer's friends packed up Scarlett's possessions.

232. When Scarlett returned to the temporary accommodation, she found her personal items packed up.

233. She was told she could not stay.

234. Now homeless, Scarlett found housing where she could, house-sitting for friends or crashing on their couches.

235. Around this time, and while Scarlett was unhoused, Gaiman approached her and offered to pay her for the past work.

236. Scarlett presented him with an invoice for her time, which he paid.

237. Later, Gaiman offered to help Scarlett by paying a few months' rent.

238. Before he would pay her the promised rent money, Gaiman required Scarlett to sign an employment agreement.

239. This employment agreement was a sham.

240. In part because it was backdated to the date Gaiman first assaulted her.

241. After Scarlett signed the agreement, Gaiman paid her a small amount of "rent money" to "get her back on her feet".

242.   This payment was nowhere near the total amount that she was owed.

243.   Gaiman and Palmer's conduct left Scarlett feeling worthless and abandoned.

244.   Scarlett later filed a police report accusing Gaiman of sexual assault.

245.   She hoped and believed that Palmer would confirm her story.

246.   She hoped and believed this because of Palmer's carefully constructed reputation.

247.   And because Palmer had expressed disgust for what Gaiman had done, calling him "Weinstein" and predicting he would be inevitably "MeTooed".

248.   Her hope was in vain.

249.   The police took no action because Palmer refused to talk to them.

250.   Having taken labor, her sense of self-worth, and her optimism, Palmer and Gaiman abandoned Scarlett – leaving her alone, penniless, and struggling.

251.   Gaiman and Palmer caused Scarlett profound physical, mental, and emotional harm, and economic losses.

252.   She brings this action because she is entitled to be compensated for that harm.

253.   And because this must never happen again.

### FIRST CAUSE OF ACTION

(Human Trafficking in Violation of 18 U.S.C. §§1591, 1595(a))

254.   Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

255.   Scarlett brings this claim pursuant to 18 U.S.C. § 1595(a), which provides for civil remedies for violations of 18 U.S.C. § 1591, both individually against Defendants Palmer and Gaiman and for civil conspiracy.

256.   18 U.S.C. § 1591 prohibits individuals from "knowingly . . . recruit[ing], harbor[ing], transport[ing], provid[ing], obtain[ing] . . . or solicit[ing] by any means a person . . .

16

knowing, . . . or . . .in reckless disregard of the fact, that means of force, fraud, coercion . . . or any combination of such means will be used to cause the person to engage in a 'commercial sex act.'"

257. A commercial sex act is "any sex act, on account of which anything of value is given to or received by any person." 18 U.S.C. § 1591(e)(3).

258. Housing is "a thing of value".

259. So is the promise of future career support.

260. Defendant received free services from Scarlett.

261. Defendant knowingly recruited, enticed, harbored, transported, and/or obtained Scarlett for labor or services while knowing she would be forced to engage in sexual acts as a condition of receiving the pay and housing they promised her.

262. Defendant knowingly recruited, enticed, harbored, transported, and/or obtained Scarlett for labor or services with reckless disregard for the fact that she would be forced to engage in sexual acts as a condition of receiving the pay and housing they promised her

263. Gaiman engaged in many nonconsensual sex acts with Scarlett.

264. Those acts were abusive and demeaning.

265. Defendant knew that a person of reasonable temperament would perceive the sex acts as abusive and demeaning.

266. Scarlett endured those acts because she would lose her job, housing, and promised future career support if she did not.

267. Sex acts performed in exchange for housing or wages are commercial sex acts.

268.    Defendant entered into an agreement with Scarlett for Scarlett to provide childcare services to Defendant, and Scarlett was then compelled to endure commercial sex acts to keep that job and the housing that came with it.

269.    Gaiman knew that Scarlett would be forced to endure commercial sex acts during her stay with him.

270.    Gaiman knew he had no intention of aiding Scarlett's career.

271.    Gaiman promised Scarlett he would do so to maintain access to her.

272.    Palmer recklessly disregarded the fact that Scarlett would be forced to endure commercial sex acts committed by Gaiman.

273.    Palmer knowingly approached and procured the services of Scarlett with reckless disregard for the fact that Gaiman would force Scarlett to engage in commercial sex acts with him.

274.    This constitutes an overt act in furtherance of Gaiman's agreed-upon violation of 18 U.S.C. § 1591.

275.    Gaiman knowingly forced Scarlett to engage in commercial sexual acts in violation of 18 U.S.C. § 1591 with Palmer's full knowledge and consent.

276.    This constitutes an overt act in furtherance of the Defendant and Gaiman's agreed-upon violation of 18 U.S.C. § 1591.

277.    Defendant received a financial benefit on account of the sexual exploitation they subjected Scarlett to, in the form of uncompensated childcare for their young son.

278.    Scarlett was forced to participate in these events because if she refused, she would have become homeless and would not have been compensated for her labor.

279. Gaiman used fraud to subject Scarlett to commercial sex acts because he had no intention of providing career support.

280. Upon information and belief, Palmer knew or should have known that Gaiman had promised future career support to his previous victims to make them submit to commercial sex acts.

281. Upon information and belief, Palmer acted with reckless disregard for the fact that Gaiman would likely use the promise of future career support to subject Scarlett to commercial sex acts because Palmer knew he had done so in the past.

282. As a direct and proximate result of the actions of the Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

283. Thus, Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION

(Human Trafficking in violation of 18 U.S.C. § 1589; Civil Conspiracy)

284. Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

285. Scarlett is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of § 1595(a) and for civil conspiracy to violate the same.

19

286. Gaiman's conduct was intended to coerce sexual services and free childcare from Scarlett by causing her to believe that if she did not perform such labor and services, she would suffer serious harm or physical restraint.

287. On information and belief, and in violation of §§ 1589 and 1595(a), Palmer knowingly benefitted from Gaiman's exploitation of Scarlett, knowing or in reckless disregard of the fact that Gaiman was obtaining Scarlett's sexual acts and childcare by means of a pattern of conduct intended to cause Scarlett to believe that if Scarlett did not perform such labor and services, Scarlett would suffer serious harm or physical restraint. On information and belief, Defendant Palmer knew or recklessly disregarded the reality that Gaiman would so coerce Scarlett.

288. On information and belief, Defendant Palmer knew or recklessly disregarded the reality that Gaiman was obtaining Scarlett's forced sexual service during her three-week indenture.

289. On information and belief, Defendant Palmer has downplayed or ignored other complaints of Gaiman's sexual assaults.

290. As a direct and proximate result of the actions of Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

291. Thus, Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities,

20

A-23

together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## THIRD CAUSE OF ACTION

(Human Trafficking in violation of 18 U.S.C. § 1590(a), 1595(a); Civil Conspiracy)

292. Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

293. Scarlett is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of 18 U.S.C. § 1595(a).

294. In violation of 18 U.S.C. § 1590(a), Defendant knowingly recruited, enticed, or obtained Scarlett for labor or services.

295. Palmer knowingly recruited Scarlett to come to Waiheke with the intention of obtaining Scarlett's uncompensated labor.

296. Palmer knowingly benefited from her recruitment and obtaining Scarlett, receiving free childcare/work/labor from Scarlett.

297. Gaiman knowingly enticed Scarlett for her labor or services when he authorized Palmer to present her with the offer of a job as his and Palmer's live-in nanny.

298. When Gaiman made this offer, he knew he planned to force Scarlett to engage in humiliating sexual conduct for his own gratification.

299. Gaiman knowingly benefited from his enticement of Scarlett, receiving free sexual services and labor from Scarlett.

300. As a direct and proximate result of the actions of the Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

21

301.     Thus, Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

### FOURTH CAUSE OF ACTION

(Conspiracy to Commit Trafficking in violation of 18 U.S.C. § 1594, 1595(a))

302.     Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

303.     Scarlett is authorized to bring this civil claim against Defendant pursuant to the civil remedies provision of § 1595(a).

304.     18 U.S.C. § 1594 criminalizes any conspiracy to violate, among other provisions, 18 U.S.C. §§ 1591 and/or 1589.

305.     As alleged herein, Gaiman and Palmer conspired to violate 18 U.S.C. §§ 1591 and/or 1589 by agreeing or conspiring to obtain the forced sexual services of women, including Scarlett, in violation of 18 U.S.C. § 1589, and sex trafficking Scarlett in violation of 18 U.S.C. § 1591.

306.     On information and belief, Defendant came to an understanding and agreement to commit and/or cover up these violations through the course of their marriage, separation, and dealings with each other.

307.     As a direct and proximate result of the actions of Defendant, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

22

A-25

308.    Scarlett is entitled to damages in an amount to be determined at trial, but which is reasonably believed to be in excess of $1,000,000.00, including, without limitation, damages to physical well-being, emotional and psychological damages, past and future economic losses, past and future physical impairment damages including but not limited to PTSD, anxiety, and depression which are physical impairments of the brain, loss of career opportunities, together with punitive damages, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FIFTH CAUSE OF ACTION

(Negligence, against Palmer)

309.    Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

310.    Scarlett repeats and realleges the facts set forth above as though more fully set forth herein.

311.    At the time that Palmer suggested to Scarlett that Scarlett babysit at Gaiman's home, Palmer knew that Gaiman was a sexual predator who enjoyed hurting women.

312.    Palmer had specific personal knowledge that Gaiman had sexually abused women in the past.

313.    Palmer had specific personal knowledge that Gaiman had raped women in the past.

314.    Palmer had specific personal knowledge that Gaiman's sexual predilections involved masochism.

315.    Palmer had specific personal knowledge that Gaiman's sexual predilections involved utter disregard for consent.

316.    Palmer knew Gaiman would likely target Scarlett for predation if she introduced Scarlett to Gaiman.

317.    Indeed, Palmer was sufficiently aware that Gaiman was likely to target Scarlett that she warned *Gaiman* to stay away from Scarlett before she brought Scarlett to Gaiman's house as a babysitter.

318.    And Palmer was specifically aware that Scarlett was in an extremely vulnerable psychological state, such that any abuse by Gaiman would severely harm Scarlett.

319.    Indeed, Palmer specifically warned Gaiman as much before bringing Scarlett to Gaiman's home.

320.    Yet Palmer never warned Scarlett of the known danger posed by Gaiman.

321.    Had Palmer warned Scarlett of the known danger posed by Gaiman, Scarlett would never have agreed to babysit Palmer's child at Gaiman's house.

322.    Indeed, upon information and belief, Palmer chose not to warn Scarlett of the danger posed by Gaiman because it would have been inconvenient for Palmer if Scarlett had declined to babysit her child at Gaiman's home.

323.    Scarlett's physical and emotional well-being was simply less important to Palmer than Palmer's convenience.

324.    Given her knowledge of Gaiman's predilections and predations, Palmer had a duty not to introduce further victims to him.

325.    Given her knowledge of Gaiman's predilections and predations, Palmer had a duty to warn Scarlett of the danger posed by Gaiman before introducing Scarlett to Gaiman.

326.    As a direct and proximate result of the actions of Palmer, Scarlett has suffered severe emotional distress, physical injuries, and economic losses. These injuries continue.

327.    By virtue of her negligence in introducing Scarlett to Gaiman and failing to warn Scarlett of the unreasonable danger Gaiman posed, Palmer is liable to Scarlett in an amount to be proven at trial, but which is reasonably believed to be in excess of $1,000,000.00

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Scarlett Pavlovich demands:

A.    Judgment against Defendant on all applicable claims, including damages to be proven at trial;

B.    Pre- and post-judgment interest on all damages awarded against Defendant

C.    Costs incurred in this suit as well as reasonable attorneys' fees; and

D.    Such other relief as the Court deems just and proper.

Dated: February 3, 2025

By: */s/Mitchell J. Matorin*_____

Mitchell J. Matorin (BBO# 649304)
MATORIN LAW OFFICE, LLC
18 Grove Street, Suite 5
Wellesley, MA 02482
Tel: (781) 453-0100
mmatorin@matorinlawoffice.com

Thomas Neville (pro hac vice pending)
Dylan Schmeyer (pro hac vice pending)
Akiva M. Cohen (pro hac vice pending)
KAMERMAN UNCYK SONIKER &
KLEIN P.C.
1700 Broadway
New York, New York 10019
Tel: (212) 400-4930
tneville@kusklaw.com
dschmeyer@kusklaw.com
acohen@kusklaw.com

Dan Lipman (pro hac vice pending)
Lorraine Parker (pro hac vice pending)
PARKER LIPMAN LLP
3200 Cherry Creek South Drive
Suite 520
Denver, Colorado 80209
Tel: (720)408-6840

*Attorneys for Plaintiff*

# MEMORANDUM AND ORDER

United States District Court
District of Massachusetts

| | |
|---|---|
| Scarlet Pavlovich,<br><br>        Plaintiff,<br><br>        v.<br><br>Amanda Palmer,<br><br>        Defendant. | )<br>)<br>)<br>)<br>)<br>)    Civil Action No.<br>)    25-10263-NMG<br>)<br>)<br>)<br>) |

MEMORANDUM & ORDER

GORTON, J.

This case arises from claims of human trafficking and conspiracy brought by plaintiff, Scarlett Pavlovich ("plaintiff" or "Pavlovich"), against Amanda Palmer ("defendant" or "Palmer"), the former wife of her alleged abuser, Neil Gaiman ("Gaiman"). Defendant has moved to dismiss for <u>forum</u> <u>non</u> <u>conveniens</u>.[1] For the following reasons, the motion to dismiss will be allowed.

---

[1] Defendant also filed motions to dismiss for failure to state a claim and for inapplicable extraterritorial conduct under the Trafficking Victims Protection Act ("TVPA"). The Court declines to reach the merits of those motions.

1

A-30

## I. Facts

The Court accepts as true all well-pled factual allegations in the complaint. Pavlovich is a citizen of New Zealand and resided therein during the relevant time period. Palmer is a U.S. citizen who was lawfully domiciled in New Zealand during the relevant time period. In 2020, the two met and became acquainted in Auckland, New Zealand. At the time Pavlovich was twenty-two years old, financially insecure and had spent time unhoused. She also had a history of mental health crises.

In February, 2022, Palmer offered to pay Pavlovich to babysit the child she shared with Gaiman, to whom she was married but from whom she was separated at the time. The job required Pavlovich to spend time at the separate homes of both Palmer and Gaiman on Waiheke Island, which is accessible only by a 40-minute ferry ride from Auckland. Pavlovich did not know nor have reason to know that Gaiman had previously been accused of sexually assaulting and/or raping numerous women.

On February 4, 2022, while Pavlovich was babysitting at Gaiman's residence, he sexually assaulted her. During the incident Gaiman stated Palmer had told him that he could not "have [Pavlovich]," which made him feel "he had to have [her]." After the attack, Pavlovich returned to Palmer's residence and

2

A-31

babysat as planned for the remainder of the weekend.  She did not mention the incident to Palmer.

Soon thereafter, Palmer offered Pavlovich a job as a live-in nanny.  The job again required Pavlovich to spend time at both residences.  Pavlovich accepted the offer after encouragement and promises of payment and career assistance by Palmer and Gaiman.  Gaiman repeatedly raped and/or sexually assaulted Pavlovich during the time she worked as the live-in nanny at both residences.  Neither Palmer nor Gaiman paid Pavlovich for her services.  As a result, Pavlovich could not afford food, transport off Waiheke Island or alternative housing.

Weeks later, Pavlovich informed Palmer about Gaiman's abuses.  Palmer allegedly was not surprised and told Pavlovich that she was aware of more than a dozen other women who had been subjected to similar sexual abuse by Gaiman.  Palmer never told Pavlovich about Gaiman's other victims prior to that conversation but offered to "take care" of Pavlovich, as she had done for other victims, by providing her with temporary accommodations in Auckland.

Pavlovich became suicidal while living in the temporary accommodations and was subsequently hospitalized for psychiatric

3

A-32

treatment.  Upon her release from the hospital, Pavlovich was told she could no longer stay in the temporary accommodations but received a small amount of "rent money" from Gaiman after she signed an employment agreement backdated to February 4, 2022, the date of the first alleged rape.

Pavlovich filed a police report accusing Gaiman of sexual assault but the police took no action and she later moved to Scotland, where she currently resides and is enrolled at a university.  Palmer currently lives in Massachusetts while Gaiman lives in Wisconsin.

## II.  Procedural History

In early February, 2025, plaintiff filed a complaint and demand for jury trial in this Court. She asserts five claims against Palmer: 1) human trafficking in violation of 18 U.S.C. §§1591, 1595(a) (count I); 2) human trafficking in violation of 18 U.S.C. §1589 and civil conspiracy (count II); 3) human trafficking in violation of 18 U.S.C. §§1590(a), 1595(a) and civil conspiracy (count III); 4) conspiracy to commit trafficking in violation of 18 U.S.C. §§1594, 1595(a) (count IV), and 5) negligence against Palmer for introducing plaintiff to Gaiman and failing to warn her of the unreasonable danger he posed.

4

A-33

Defendant now moves to dismiss all claims for <u>forum non conveniens</u> pursuant to Fed. R. Civ. P. 12(b)(3).

### III. Legal Standard

Forum non conveniens is a discretionary defense that empowers a district court to dismiss an action when a court abroad is the more appropriate and convenient forum. <u>Sysco Mach. Corp.</u> v. <u>Cymtek Sols., Inc.</u>, 124 F.4th 32, 37 (1st Cir. 2024). Although plaintiff's chosen forum is entitled to deference, that presumption applies with less force when the plaintiff's choice is not her home forum. <u>Id.</u>

The moving party's burden is twofold; it must establish that (1) an adequate alternative forum is available and (2) considerations of convenience and judicial efficiency strongly favor litigating the claim in that alternative forum. <u>Adelson</u> v. <u>Hananel</u>, 510 F.3d 43, 52 (1st Cir. 2007).

### A. Adequate Forum

An adequate forum must meet two requirements: (1) all parties are subject to that forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court. <u>Imamura</u> v. <u>Gen. Elec. Co.</u>, 957 F.3d 98, 106 (1st Cir. 2020).

5

The first requirement (the forum's "availability") is typically satisfied if the defendant is amenable to service of process there. Id.  As to the second requirement (the forum's "adequacy"), an alternative forum is adequate unless the remedy it provides "is so clearly inadequate or unsatisfactory that it is no remedy at all." Id.

## B. Convenience and Judicial Efficiency

The second and more complicated inquiry involves balancing "the compendium of factors relevant to the private and public interests implicated by the case" to determine whether defendant has demonstrated that dismissal is appropriate.  Relevant private interest factors include

> the relative ease of access to sources of proof; availability [and cost] of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . and all other practical problems that make trial of a case easy, expeditious[,] and inexpensive.

Id. at 107.  The relevant public interest factors include

> the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

Id. (internal quotations omitted).

6

A-35

## IV.  Analysis

### A. Availability and Adequacy

It is undisputed that Palmer stipulated to service of process in New Zealand.  The Court need not undertake additional analysis on availability.

Plaintiff contests the adequacy of New Zealand as an alternative forum.  She argues that, because New Zealand has adopted a no-fault compensation scheme for victims of accidents and intentional torts outside of the court system ("the Accident Compensation Corporation" or "ACC"), New Zealand cannot be considered an adequate alternative forum.

The fact that plaintiff's claim in New Zealand would be handled outside of the judicial system does not necessarily mean New Zealand is an inadequate forum.  Indeed, courts have consistently found New Zealand (and many other countries with similar adjudicative remedies) to be adequate alternative forums notwithstanding the lack of formal court proceedings. See, e.g., Lueck v. Sundstrand Corp., 236 F.3d 1137, 1144 (9th Cir. 2011); Imamura, 957 F.3d at 112.  The relevant inquiry is not whether litigation is available but whether the remedy offered "is so clearly inadequate or unsatisfactory that it is no remedy at

7

A-36

all." Imamura, 957 F.3d at 106.  That is plainly not the case here.

Although the ACC does not provide compensation to victims for purely emotional injuries, victims are afforded access to free mental health services to treat any emotional injury. Given that a compensatory damage award would presumably be used to pay for that kind of treatment, the Court finds such a remedy to be sufficient.

Plaintiff responds that she does not live in New Zealand and thus cannot access available services.  Yet the record before this Court indicates that she was receiving government-sponsored therapy until she voluntarily left New Zealand in 2024.  Thus, plaintiff has already received a remedy for her mental injuries.

The therapy provided by the ACC without cost is not the only remedy available to Pavlovich in New Zealand; she could also pursue exemplary damages for egregious conduct.  Plaintiff responds that "such damages do not provide compensation for the injuries Scarlet suffered."  Whether such exemplary damages are awarded specifically for her pain and suffering is irrelevant; their availability demonstrates that remedies beyond the ACC are available to her.

8

A-37

Although such remedies may be less comprehensive than those available in the United States, plaintiff is not without relief in New Zealand.  That is all that is required under the doctrine of *forum* *non* *conveniens* for New Zealand to be deemed an adequate forum.

## B. Convenience and Judicial Economy

The Court proceeds to consideration of the private and public interests implicated by the case and its possible transfer.

### i.  Private Interests

The primary inquiry under the private interest analysis is the convenience of the parties and access to witnesses and evidence.  Pavlovich contends that the case has only three key witnesses: Palmer, Gaiman and herself, none of whom currently resides in New Zealand.  That argument ignores the fundamental fact that Gaiman and Palmer have both agreed to submit to the jurisdiction of New Zealand.  The Court will not ignore that reality and exercise jurisdiction over parties in a civil case who would clearly be inconvenienced thereby and would prefer to proceed in New Zealand.

As for plaintiff's convenience, although the flight from the United Kingdom to New Zealand is prodigious, the flight to

9

A-38

Massachusetts is hardly convenient.  In either case, Pavlovich will need to fly thousands of miles overseas, and the closer proximity of Massachusetts does not outweigh the other factors in favor of dismissal.

Pavlovich takes issue with Palmer's claim that all relevant witnesses and evidence are in New Zealand, noting that Palmer has not identified any specific testimony that would be proffered in New Zealand.  The same can, however, be said of Pavlovich who has not identified any potential witness in Massachusetts other than Palmer.  Furthermore, Palmer has made it clear that she is amenable to jurisdiction in New Zealand.

Finally, Pavlovich claims that dismissal of her case would make it more difficult to coordinate this case with the one against Gaiman, which has been filed in the Western District of Wisconsin.  That argument is now moot because the case against Gaiman was dismissed for forum non conveniens in October, 2025.

In sum, the private interests tilt in favor of dismissal.

### ii. Public Interests

The public interest analysis, as briefed by the parties, depends upon which forum has a stronger interest in adjudicating the dispute.  Notwithstanding the fact that all relevant conduct occurred in New Zealand, Pavlovich asserts that the United

10

A-39

States has a strong interest in hearing the case. The only support she offers for her contention is that, under the TVPA, American courts have extraterritorial jurisdiction over any offense identified in certain criminal laws prohibiting trafficking, and victims of those criminal laws may bring civil actions against the perpetrators to recover damages. Pavlovich suggests that because the criminal actions 1) have extraterritorial application and 2) allow victims to pursue civil claims, a civil action brought by a victim has extraterritorial application as well.

The problem with that reasoning is that the TVPA civil remedy does not apply extraterritorially, and Supreme Court precedent indicates that, in the absence of any statutory language authorizing extraterritorial application, such a civil remedy is limited to domestic application. RJR Nabisco v. Eur. Cmty., 579 U.S. 325 (2016) (holding that RICO's civil remedies provision lacks extraterritorial application, notwithstanding the extraterritorial reach of the underlying criminal provisions).

The First Circuit has not considered whether the civil remedy provision applies extra-territorially and other appeals courts have differed in their holdings. Given such uncertainty,

11

A-40

this Court is disinclined to find that Pavlovich's civil claim has extraterritorial application. Even assuming, arguendo, that the TVPA civil remedy provision applies outside the United States, there is no caselaw support for the proposition that it is relevant to a forum non conveniens inquiry.

Having disposed of the TVPA issue, it is clear to the Court that New Zealand has a greater interest in deciding this case. Plaintiff is a citizen of New Zealand, all the underlying conduct took place in New Zealand and defendant was a lawful resident of New Zealand during the relevant time period. Common sense dictates that New Zealand is the more interested forum. As United States District Judge James D. Peterson (W.D. Wis.) observed when dismissing Pavlovich's case against Gaiman,

> [Massachusetts] jurors would be scratching their heads about how and why they were being asked to decide a dispute regarding such far away events that have nothing to do with them.

12

A-41

## ORDER

For the foregoing reasons, the motion to dismiss for <u>forum</u> <u>non conveniens</u> is **ALLOWED**.

**So ordered.**

_Nathaniel M. Gorton_

Nathaniel M. Gorton
Senior United States District Judge

Dated:  February 6 , 2026

13

A-42

## ORDER OF DISMISSAL

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  | Civil Action |
| Plaintiff | No: 1:25-cv-10263-NMG |

Imer Payes Gonzalez

v.

Defendant

Amanda Palmer

ORDER OF DISMISSAL

GORTON, D.J.

In accordance with the Courts Order entered on February 6, 2026, it is hereby ORDERED that the above-entitled action be and hereby is dismissed.

By the Court,

/s/ Nicole Cowan
Docket Clerk

February 6, 2026

A-43