No. 26-1151

---

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

---

SCARLETT PAVLOVICH,

*Plaintiff-Appellant,*

v.

AMANDA PALMER,

*Defendant-Appellee.*

---

On Appeal from the United States District Court
for the District of Massachusetts (Gorton, J.)

---

## BRIEF OF DEFENDANT-APPELLEE

---

Daniel N. Marx (#1150876)
Fick & Marx LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com

*Counsel for Amanda Palmer*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

INTRODUCTION .............................................................................. 1

STATEMENT OF THE CASE ............................................................ 2

      A.    Factual Allegations ............................................................ 2

      B.    Procedural History ............................................................. 5

      C.    Parallel Proceedings .......................................................... 6

SUMMARY OF THE ARGUMENT ..................................................... 8

ARGUMENT ...................................................................................... 8

I.    Standard of Appellate Review ........................................... 9

II.    Pavlovich waived her new argument that the *forum non conveniens* doctrine does not apply to her civil TVPA claims because she failed to raise that argument below. ...................................................... 11

III.    The *forum non conveniens* doctrine applies to all Pavlovich's claims, including her civil TVPA claims. ................................................. 14

IV.    The District Court did not abuse its discretion in dismissing Pavlovich's claims on the basis of *forum non conveniens*. .............. 22

      A.    The District Court properly applied the well-established *forum non conveniens* framework. ..................................... 22

      B.    The District Court gave appropriate deference to Pavlovich's strategic decision to sue in a foreign forum rather than her home forum ................................................................... 25

      C.    The District Court reasonably concluded that New Zealand is an available, adequate forum. ............................................. 26

      D.    The District Court reasonably weighed the public factors which favor New Zealand ..................................................... 31

E.    The District Court reasonably weighed the private factors which also favor New Zealand. ..............................................36

V.    The District Court correctly concluded the TVPA does not authorize civil claims by foreign plaintiffs arising from alleged foreign conduct. .....................................................................................38

A.    Federal statutes must be read with a presumption against extraterritoriality. ...............................................................39

B.    The civil-remedies provision of the TVPA does not expressly provide for extraterritorial application. ...............................43

C.    Congress has made no clear, affirmative statement that the civil-remedies provision reaches alleged foreign conduct. ...45

D.    Although the courts are split, the better reasoned decisions have followed *RJR Nabisco* and rejected similar TVPA claims concerning foreign conduct. .................................................50

CONCLUSION .......................................................................................58

CERTIFICATE OF COMPLIANCE.......................................................59

CERTIFICATE OF SERVICE................................................................60

# TABLE OF AUTHORITIES

## Cases

*Abernathy v. Carlyle Group, Inc.*,
  2024 U.S. Dist. LEXIS 237526 (D.D.C. 2024) .............................52

*Abitron Austria GmbH v. Hetronic International, Inc.*,
  600 U.S. 412 (2023) ........................................................47

*Adelson v. Hananel*,
  510 F.3d 43 (1st Cir. 2007)................................................24, 26

*Adhikari v. Kellogg, Brown & Root, Inc.*,
  845 F.3d 184 (5th Cir. 2017) ..............................................58, 59

*American Dredging Co. v. Miller*,
  510 U.S. 443 (1994) ........................................... 13, 21, 22

*B&T Masonry Construction Co. v. Public Service Mutual Insurance Co.*,
  382 F.3d 36 (1st Cir. 2004)...............................................12

*Capital Currency Exchange v. National Westminster Bank PLC*,
  155 F.3d 603 (2d Cir. 1998)............................................ 16, 17, 19

*Compania de Inversiones Mercantiles v. Grupo Cementos de Chihuana*,
  58 F.4th 429 (10th Cir. 2023).........................................56

*Corporate Technologies, Inc. v. Harnett*,
  731 F.3d 6 (1st Cir. 2013)...............................................11

*Curtis v. Galakatos*,
  19 F.4th 41 (1st Cir. 2021) ............................................27

*Dandong Old North-East Agricultural & Animal Husbandry Co. v. Hu*,
  2017 U.S. Dist. LEXIS 122471 (S.D.N.Y. 2017) ...........................57

iii

*Doe v. Apple, Inc.*,
   96 F.4th 403 (D.C. Cir. 2024) .......................................................53

*Doe v. Apple, Inc.*,
   2021 U.S. Dist. LEXIS 237710 (D.D.C. 2021) ....................... *passim*

*Doe v. Nestle USA, S.A.*,
   929 F.3d 623 (9th Cir. 2021) ........................................................45

*Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*,
   91 F.4th 511 (1st Cir. 2024) ............................................. 40, 41, 46

*Flack v. Nutribullet, LLC*,
   2018 U.S. Dist. LEXIS 205356 (C.D. Cal. 2018)...........................28

*Foley Brothers v. Filardo*,
   336 U.S. 281 (1949) .....................................................................40

*Howe v. Goldcorp Investors Ltd.*,
   946 F.2d 944 (1st Cir. 1991)................................................ *passim*

*Imamura v. GE Co.*,
   957 F.3d 98 (1st Cir. 2020)......................................... 11, 24, 25, 27

*In re Aircrash Disaster Near New Orleans*,
   821 F.2d 1147 (5th Cir. 1987) (*en banc*).................................. 16, 35

*In re Silicone Gel Breast Implant Products Liability Litigation*,
   887 F. Supp. 1469 (N.D. Ala. 1995) .............................................29

*In re Volkswagen AG*,
   2023 U.S. App. LEXIS 31195 (5th Cir. 2023) ..............................17

*Intec USA LLC v. Engle*,
   2005 U.S. Dist. LEXIS 33365 (N.D. Ill. 2005) ........................ 29, 36

*Iragorri v. International Elevator, Inc.*,
   203 F.3d 8 (1st Cir. 2000)..............................................................10

iv

*Jane Doe L.C. v. Aimbridge Hospital, LLC,*
2020 U.S. Dist. LEXIS 172336 (D. Del. 2020) ..............................37

*Kiobel v. Royal Dutch Petroleum Co.,*
569 U.S. 108 (2013) ......................................................................41

*La Seguridad v. Transytur Line,*
707 F.2d 1304 (11th Cir. 1983) ....................................................18

*Lueck v. Sundstrand Corp.,*
236 F.3d 1137 (9th Cir. 2011) ...............................................28, 36

*Mia v. Kimberly-Clark Corp.,*
2025 U.S. Dist. LEXIS 42876 (D.D.C. 2025) ..........................51, 53

*Microsoft Corp. v. AT&T Corp.,*
550 U.S. 437 (2007) ......................................................................40

*Morrison v. National Austrialia Bank Ltd.,*
561 U.S. 247 (2010) .................................................... 40, 41, 47, 50

*Pavlovich v. Gaiman,*
179 F.4th 603 (7th Cir. 2026)............................................... *passim*

*Piper Aircraft Co. v. Reyno,*
454 U.S. 235 (1981) ................................................................ 10, 27

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,*
244 F. Supp. 2d 289 (S.D.N.Y. 2003) .....................................34, 35

*Prevent USA Corp. v. Volkswagen AG,*
17 F.4th 653 (6th Cir. 2021)....................................................16, 17

*Privitera v. Curran,*
855 F.3d 19 (1st Cir. 2017)............................................................12

*Ratha v. Rubicon Resolution, LLC,*
168 F.4th 541 (9th Cir. 2025) (*en banc*).......................................58

*RJR Nabisco, Inc. v. European Community*,
    579 U.S. 325 (2016) ................................................................ *passim*

*Roe v. Howard*,
    917 F.3d 229 (4th Cir. 2019) ................................................. 53, 54

*S.R.J. v. Marriott International, Inc.*,
    2022 U.S. Dist. LEXIS 191019 (W.D. Pa. 2022) .......................... 37

*Sinochem International Co. v. Malaysia International Shipping Corp.*,
    549 U.S. 422 (2007) ........................................................... 10, 27

*Smith v. United States*,
    507 U.S. 197 (1993) ................................................................ 41

*Solvander v. American Medical Systems*,
    2014 U.S. Dist. LEXIS 19780 (S.D.W.V. 2014) ............................ 29

*Stonehill v. International Harvester Co.*,
    132 Ill. App. 3d 1043 (Ill. App. Ct. 1985) ..................................... 29

*Sysco Machinery Corp. v. Cymtek Solutions, Inc.*,
    124 F.4th 32 (1st Cir. 2024) ............................................. 10, 23, 25

*Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline
    Transportation Co.*, 953 F.2d 17 (1st Cir. 1992) ........................... 12

*Transunion Corp. v. Pepsico, Inc.*,
    811 F.2d 127 (2d Cir. 1987) ...................................................... 16

*United States ex rel. Fadlalla v. Dyncorp International LLC*,
    402 F. Supp. 3d 162 (D. Md. 2019) ............................................. 56

*United States ex rel. Hawkins v. ManTech International Corp.*,
    752 F. Supp. 3d 118 (D.D.C. 2024) ......................................... 52, 53

*United States v. National City Lines*,
    337 U.S. 78 (1949) .................................................................. 18

*United States v. National City Lines,*
     334 U.S. 573 (1948) ........................................................... 13, 14, 21

*WesternGeco LLC v. ION Geophysical Corp.,*
     585 U.S. 407 (2018) ........................................................................ 40

*Wiwa v. Royal Dutch Petroleum Co.,*
     226 F.3d 88 (2d Cir. 2000) ................................................... *passim*

*Xu Lun v. Milwaukee Electric Tool Corp.,*
     2025 U.S. Dist. LEXIS 233614 (E.D. Wisc. 2025) ............. 45, 48, 51

*Yegiazaryan v. Smagin,*
     599 U.S. 533 (2023) ........................................................................ 40

## Statutes and Rules

15 U.S.C. § 78j(b) ....................................................................................... 14

15 U.S.C. § 22 ............................................................................................ 16

15 U.S.C. § 77g(a) ...................................................................................... 14

18 U.S.C. § 7(9) .......................................................................................... 55

18 U.S.C § 1581 *et seq.* ...................................................................... *passim*

18 U.S.C. § 1961 *et seq.* ........................................................................... 42

18 U.S.C. § 3271 ................................................................................... 55, 56

28 U.S.C. § 1350 ........................................................................................ 22

28 U.S.C. § 1404(a) ................................................................................... 17

Federal Rule of Appellate Procuere 28(j) ................................................. 2

## INTRODUCTION

Plaintiff-Appellant Scarlett Pavlovich, a citizen of New Zealand and resident of Scotland, sued Neil Gaiman, a citizen of England and former resident of New Zealand, in federal court in Wisconsin, alleging that he sexually assaulted her when she briefly worked as a babysitter for Gaiman and Defendant-Appellee Amanda Palmer in New Zealand in early 2022.

Pavlovich also sued Ms. Palmer in federal court in Massachusetts, filing a nearly identical complaint and seeking to hold Ms. Palmer financially liable for Gaiman's alleged sexual assaults, even though Ms. Palmer was separated from Gaiman at the time, lived in a different home, and was never present when the assaults supposedly occurred.

Gaiman and Ms. Palmer moved to dismiss the Wisconsin and Massachusetts actions, respectively, on the basis of *forum non conveniens*, and both district courts allowed those motions, ruling that New Zealand was an available, adequate forum with a stronger connection to Pavlovich's claims regarding Gaiman's alleged sexual assaults in New Zealand.

1

Since then, the Seventh Circuit has affirmed the dismissal of Pavlovich's action in Wisconsin against Gaiman, holding the district court did not abuse its discretion in applying the *forum non conveniens* doctrine. *See Pavlovich v. Gaiman*, 179 F.4th 603, 2026 U.S. App. LEXIS 18866 (7th Cir. June 29, 2026).[1] This Court should now reach that same sensible result and affirm the dismissal of Pavlovich's action in Massachusetts against Ms. Palmer.

## STATEMENT OF THE CASE

### A.   Factual Allegations[2]

In 2020, Pavlovich met Ms. Palmer in Auckland, New Zealand. A6 (¶¶ 19, 22).[3] At the time, Ms. Palmer was married to but separated from Gaiman, with whom she shares a child. A6 *(*¶¶ 14, 16). Ms. Palmer and

---

[1] Although Pavlovich filed her appeal brief with this Court on April 28, 2026, and the Seventh Circuit rejected her appeal in the parallel case on June 29, 2026, she chose not to notify this Court of that "pertinent" and "significant" supplemental authority. *See* Fed. R. App. P. 28(j).

[2] For the purpose of this appeal, Ms. Palmer bases her Statement of the Case on the factual allegations in Pavlovich's complaint.

[3] "A_" refers to the Appendix that Pavlovich filed with her brief; "D.E. _" refers to docket entries in the District Court below, and "Wisc. D.E. __" refers to docket entries in the District Court for the Western District of Wisconsin.

Gaiman lived in separate homes on Waiheke, an island that is a 40-minute ferry ride from Auckland. A6 (¶¶ 16, 23-24).

In early 2022, Ms. Palmer asked Pavlovich to "babysit for the weekend," a job that "would entail spending time at both houses." A7 (¶¶ 36, 37, 39). A few days later, on February 4, 2022, Pavlovich arrived "at Gaiman's house," and "spent an hour with the child." A7 (¶¶ 42, 43). Later, after Gaiman dropped the child off at a friend's house, he returned to his house, gave Pavlovich a "tour of the grounds," and had dinner with her. A8 (¶¶ 45, 47, 48). According to Pavlovich, while she was alone with Gaiman, they took a bath together, and he raped her. A8-10 (¶¶ 51-84).

"After the weekend," and unaware of anything that may have happened between Pavlovich and Gaiman, Ms. Palmer offered Pavlovich "a job as a live-in nanny." A11 (¶ 111). Pavlovich "accepted the job," which like her babysitting work, "required her to care for the child at both Ms. Palmer's and Gaiman's houses." A12 (¶¶ 118, 119).

According to Pavlovich, while she worked as a babysitter, "Gamain repeatedly raped [her]." A12 (¶ 124). One of the alleged incidents occurred at Gaiman's home in Waiheke, and another at a hotel in Auckland. A12-15 (¶¶ 125-135, 155-177). Pavlovich does not allege that

Ms. Palmer was ever present when the assaults by Gaiman supposedly occurred, much less that Ms. Palmer participated in any way.

According to Pavlovich, after Gaiman and the child left New Zealand on a trip to Europe, she told Ms. Palmer "much of what Gaiman had been doing to her." A17 (¶ 213). In response, Ms. Palmer helped Pavlovich find "temporary accommodations" in Auckland. A17 (¶ 224). When Pavlovich later "became suicidal," she was treated at a "psychiatric respite center" in New Zealand. A18 (¶¶ 228, 230). After Pavlovich left the center, she moved from the housing that Ms. Palmer had arranged to other housing with friends in New Zealand. A18 (¶ 234).

At some point, when Pavlovich was living with friends and no longer babysitting, Gaiman approached her in New Zealand and offered to pay for her past childcare services. A18 (¶ 235). Pavlovich gave Gaiman "an invoice for her time, which he paid." A18 (¶ 236). Gaiman also offered to help Pavlovich to pay rent, and in exchange, he required her to sign an employment agreement that she claims was a "sham." A18 (¶¶ 237-41).

"Later," Pavlovich filed a police report with local authorities in New Zealand, accusing Gaiman (but not Ms. Palmer) of sexual assault. A19

4

(¶ 244). The police took no action, and in her Complaint, Pavlovich blames Ms. Palmer, alleging she "refused to talk to them." A19 (¶ 249).

### B. Procedural History

On February 3, 2025, Pavlovich filed her complaint against Ms. Palmer, alleging violations of the Trafficking Victims Protection Act ("TVPA") and negligence. A4.

On April 21, 2025, Ms. Palmer moved to dismiss the complaint on three separate grounds: (1) the complaint failed to assert any claims on which relief could be granted, D.E. 12-13; (2) the TVPA did not authorize Pavlovich to use the federal courts in the United States to litigate claims arising from alleged sexual assaults that supposedly occurred in New Zealand, D.E. 14-15; and (3) the complaint should be dismissed on the basis of *forum non conveniens*, D.E. 16-17.

In support of her *forum non conveniens* motion, Ms. Palmer submitted an affidavit in which she swore that at all times relevant to Pavlovich's claims, she lived in New Zealand; that she would accept service of any valid legal or administrative process in New Zealand, and that if an action were to proceed in New Zealand, she would appear as a witness and make available any relevant evidence in her possession. D.E.

17-1 (Aff. of Amanda Palmer). She also submitted the declaration of an expert on civil and criminal law in New Zealand who reviewed Pavlovich's claims against Ms. Palmer and Gaiman in the United States and opined on Pavlovich's available remedies in New Zealand. D.E. 28-1 (Decl. of David P.H. Jones, King's Counsel).

On June 4, 2025, Pavlovich opposed all three motions. D.E. 21, 22, 23. Notably, however, Pavlovich did not dispute that Ms. Palmer had adequately consented to jurisdiction in New Zealand.

On February 6, 2026, the District Court allowed Ms. Palmer's motion to dismiss on the basis of *forum non conveniens*. A30. It declined to reach the merits of her other motions. A30. On the same day, the District Court issued an order of dismissal. A43.

On February 11, 2026, Pavlovich filed her notice of appeal. D.E. 34.

### C. Parallel Proceedings

When Pavlovich sued Ms. Palmer in the U.S. District Court for the District Massachusetts, she also sued Gaiman in the U.S. District Court for the Western District of Wisconsin. *See United States v. Gaiman*, No. 3:25-cv-00078 (JDP) (W.D. Wisc.), Wisc. D.E. 1-2.

Like Ms. Palmer, Gaiman moved to dismiss on the basis of *forum non conveniens*, Wisc. D.E. 18-19, and Pavlovich opposed his motion, Wisc. D.E. 36.

The district court in Wisconsin allowed Gaiman's motion and dismissed Pavlovich's complaint. Wisc. D.E. 51.

Pavlovich then appealed to the U.S. Court of Appeals for the Seventh Circuit. Wisc. D.E. 54.

On June 29, 2026, the Seventh Circuit affirmed the dismissal of Pavlovich's complaint, holding the district court did not abuse its discretion in concluding that "New Zealand is the more convenient forum to hear this dispute." *Pavlovich v. Gaiman*, 179 F.4th 603, 2026 U.S. App. LEXIS 18866, at *1-2 (7th Cir. June 29, 2026).

During the oral argument for her appeal, Pavlovich conceded the doctrine of *forum non conveniens* applies to TVPA claims. *See id.* at *14 (noting that Pavlovich "expressly waived [the contrary argument that the TVPA supplants the *forum non conveniens* doctrine] at oral argument"). As discussed below, she has taken the opposite position in this appeal, an argument she did not raise in the District Court.

7

## SUMMARY OF THE ARGUMENT

Pavlovich, a citizen of New Zealand and resident of Scotland, claims that Neil Gaiman, a citizen of England and former resident of New Zealand, allegedly raped her, while she briefly worked as a babysitter in New Zealand for Gaiman and Ms. Palmer, a citizen of the United States and former resident of New Zealand, at a time when Gaiman and Ms. Palmer were separated and living in different homes.

Pavlovich contends that the District Court abused its considerable discretion when it ruled New Zealand is an available, adequate forum with a stronger interest in this civil matter and, on the basis of *forum non conveniens*, dismissed her claims against Ms. Palmer. Pavlovich is incorrect, and the judgment below should be affirmed.

First, to the extent that Pavlovich now argues the *forum non conveniens* doctrine does not apply to her civil claims under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. § 1581 *et seq.*, because the statute has a "special venue" provision, *id.* § 1596, she failed to raise that argument below and, as a result, waived it. (pp11-13)

In any event, as a legal matter, the *forum non conveniens* doctrine applies to all Pavlovich's claims, including her TVPA claims. (pp14-22)

8

Moreover, in applying the *forum non conveniens* doctrine, the District Court did not abuse its considerable discretion. Properly applying the well-established framework, the District Court gave appropriate deference to Pavlovich's choice of a U.S. forum (rather than her own home forum); correctly concluded that New Zealand is an available, adequate forum for this dispute; and reasonably weighed the public and private factors. (pp22-38)

Finally, Pavlovich is mistaken that the TVPA authorizes her to press civil claims against Ms. Palmer in the United States that she was sexually assaulted by Gaiman in New Zealand. But this Court need not decide that statutory issue, because even assuming the extraterritorial application of the TVPA's civil-remedies provision, *id.* § 1595, dismissal on the basis of *forum non conveniens* was still appropriate—and certainly, not an abuse of discretion. (pp38-58)

## ARGUMENT

### I.    Standard of Appellate Review

The decision to dismiss an action on the basis of *forum non conveniens* "'may be reversed only when there has been a clear abuse of discretion.'" *Iragorri v. Int'l Elevator, Inc.*, 203 F.3d 8, 12 (1st Cir. 2000)

9

(quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 257 (1981)) (finding no abuse of discretion and affirming dismissal); *see also Sinochem Int'l Co. v. Malay. Int'l Shipping Corp.*, 549 U.S. 422, 425 (2007) (noting that "in conducting a *forum non conveniens* analysis, a district court enjoys significant discretion to assess evidence and arguments as it sees fit").

An abuse of discretion will be found only "if the district court (1) failed to consider a material factor, (2) substantially relied on an improper factor, or (3) assessed the proper factors, but clearly erred in weighing them." *Sysco Mach. Corp. v. Cymtek Sols., Inc.*, 124 F.4th 32, 37 (1st Cir. 2024) (finding no abuse of discretion and affirming dismissal).

In considering those issues, "a reviewing court must assiduously avoid twin temptations: it must neither substitute its judgment for that of the district court nor strike the balance of relevant factors anew." *Iragorri*, 203 F.3d at 12. That is because the abuse-of-discretion standard "imposes 'a formidable burden' on anyone 'attempting to convince the court of appeals that the lower court erred.'" *Sysco Mach. Corp.*, 124 F.4th at 37 (quoting *Rivera-Aponte v. Gomez Bus Line, Inc.*, 62 F.4th 1, 7 (1st Cir. 2023) (further quotations omitted)).

Any error of law will be reviewed *de novo*, because "'a material error of law invariably constitutes an abuse of discretion.'" *Imamura v. GE Co.*, 957 F.3d 98, 106 (1st Cir. 2020) (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)) (finding no abuse of discretion and affirming dismissal).

## II.    Pavlovich waived her new argument that the *forum non conveniens* doctrine does not apply to her civil TVPA claims because she failed to raise that argument below.

For the first time, on appeal, Pavlovich argues the doctrine of *forum non conveniens* does not apply in any civil action that involves a TVPA claim. As explained below, her argument is incorrect, and no precedent supports it. *See* Argument, III, *infra*. But as an initial matter, Pavlovich waived the contention by failing to raise it in the District Court.

"If any principle is settled in this circuit, it is that, absent the most extraordinary circumstances, legal theories not raised squarely in the lower court cannot be broached for the first time on appeal." *Teamsters, Chauffeurs, Warehousemen & Helpers Union v. Superline Transp. Co.*, 953 F.2d 17, 21 (1st Cir. 1992); *see also Privitera v. Curran*, 855 F.3d 19, 27 n.4 (1st Cir. 2017) (holding "arguments advanced for the first time on appeal are deemed waived" and refusing to consider new argument "in a

11

Case: 26-1151 Document: 00118482895 Page: 20 Date Filed: 07/28/2026 Entry ID: 6829449

last-ditch attempt to snatch victory from the jaws of defeat"). A party who raises a new argument on appeal "violates a prudential principle firmly embedded in our jurisprudence," and "[c]ases holding to that effect are legion." *B&T Masonry Constr. Co. v. Pub. Serv. Mut. Ins. Co.*, 382 F.3d 36, 40 (1st Cir. 2004) (collecting cases).

Below, Pavlovich failed to "squarely raise" her new (and erroneous) argument that the *forum non conveniens* doctrine does not apply in this case. Indeed, she did not raise that argument at all.

In her opposition to Ms. Palmer's motion to dismiss on the basis of *forum non conveniens*, Pavlovich argued only that (1) New Zealand was not an available or adequate forum; (2) her choice to sue in the United States was entitled to deference, and (3) the balance of public and private factors, including the interests of justice, favored the United States. D.E. 22. All those arguments fit within the familiar *forum non conveniens* framework; none challenged the applicability of the doctrine altogether.

Comparing Pavlovich's appeal brief in this Court to her opposition brief in the District Court further illustrates her waiver. The appeal brief includes a section titled, "The Common Law Doctrine of Forum Non Conveniens Has No Application to TVPA Claims," Br. at 17-20, but the

12

opposition brief below included no similar section. Nor did it make arguments based on—or even cite to—the cases on which her appeal brief relies to mistakenly assert that the TVPA somehow displaces the *forum non conveniens* doctrine: *United States v. National City Lines*, 334 U.S. 573 (1948); *American Dredging Co. v. Miller*, 510 U.S. 443 (1994), and *Howe v. Goldcorp Investors Ltd.*, 946 F.2d 944 (1st Cir. 1991).

In a thorough and thoughtful memorandum and order, the District Court applied the *forum non conveniens* framework, rejected Pavlovich's arguments, and allowed Ms. Palmer's motion. A30. Pavlovich did not seek reconsideration on the grounds that the District Court had erred as a matter of law by applying that framework. She cannot advance that novel argument for the first time on appeal in this Court.[4]

---

[4] In her action in Wisconsin against Gaiman, Pavlovich never argued—in the district court or the appeals court—that as a categorical matter, the *forum non conveniens* doctrine does not apply to her TVPA claims. In fact, at oral argument in the Seventh Circuit on April 8, the panel asked Pavlovich's appellate counsel whether the *forum non conveniens* doctrine applies. Counsel, who also represents Pavlovich in this appeal, explicitly conceded the doctrine applies and simply argued the extraterritorial reach of the TVPA is a "public factor" to be considered. *See* Oral Argument Recording at 7:45 to 10:15, *available at* https://media.ca7.uscourts.gov/sound/2026/gw.25-2754.25-2754_04_08_2026.mp3 .

13

### III. The *forum non conveniens* doctrine applies to all Pavlovich's claims, including her civil TVPA claims.

Pavlovich contends that, "where Congress has specifically designated a forum for particular claims, courts may not rely on *forum non conveniens* to deprive the plaintiff of that chosen forum." Br. 17 (citing *United States v. National City Lines*, 334 U.S. 573 (1948) ("*National City Lines I*"), an antitrust case). That argument is plainly incorrect, and *National City Lines I*, which is no longer good law, does not remotely support it.

This Court has already rejected Pavlovich's misreading of the Supreme Court's 1948 antitrust decision. In *Howe v. Goldcorp Investments, Ltd.*, 946 F.2d 944 (1st Cir. 1991) (Breyer, C.J.), this Court held that, notwithstanding *National City Lines I*, "the federal court possesses the power to invoke the *forum non conveniens* doctrine in a private securities law action" and that the district court had properly dismissed the civil action on that basis. *Id.* at 945.

In *Howe*, the plaintiff brought fraud claims under the Exchange Act, 15 U.S.C. § 78j(b), and Securities Act, 15 U.S.C. § 77g(a), based on "conduct that took place primarily (but not entirely) outside the United States." *Id.* In an amicus brief, the SEC argued: "The fact that Congress

enacted . . . 'special venue' provisions . . . means that Congress did not want the federal courts to apply the *forum non conveniens* doctrine at all[.]" *Id.* at 948. This Court rejected that argument, because among other reasons, "the [Supreme] Court in *National City Lines I* considered *only* domestic transfers; it did not consider international transfers at all." *Id.*; *see also id.* at 950 ("[W]e reject the SEC's argument that the courts *never* have the power to dismiss a private securities law case on *forum non conveniens* grounds.") (emphasis in original).[5] This Court held that, rather than foreclose any *forum non conveniens* analysis, special venue provisions, like the one in the TVPA, "simply add[] to the number of courts *empowered* to hear a plaintiff's claim." *Id.* at 662. In other words, this Court has made clear that, based on such a provision, a federal court may hear a statutory claim, but it is not required to, especially when a

---

[5] This Court also noted that "most case law in recent years has taken positions contrary to that which the SEC now urges upon us"—and which Pavlovich urges here. *Howe*, 946 F.2d at 949 (*citing Transunion Corp. v. Pepsico, Inc.*, 811 F.2d 127, 130 (2d Cir. 1987) (*forum non conveniens* applicable in RICO cases notwithstanding special venue provision); *In re Aircrash Disaster Near New Orleans*, 821 F.2d 1147, 1163-64 (5th Cir. 1987) (*en banc*) (same for Jones Act cases)). Since *Howe*, the consensus in the case law has only grown. *See, e.g., Cap. Currency Exch. v. Nat'l Westminster Bank PLC*, 155 F.3d 603 (2d Cir. 1998) (same for Sherman Act).

more appropriate, foreign forum is available. Yet Pavlovich reprises that rejected argument, and in doing so, she misreads *Howe*.

Other circuits have uniformly followed *Howe*. For example, in *Prevent USA Corp. v. Volkswagen AG*, 17 F.4th 653 (6th Cir. 2021), the Sixth Circuit affirmed an order that dismissed an antitrust complaint on the basis of *forum non conveniens* because Germany was a more appropriate forum than the United States. *See id.* at 656. Endorsing then-Chief Judge Breyer's reasoning in *Howe*, the Sixth Circuit held that *National City Lines I* did "not control th[e] case" and that the special venue provision in the Clayton Act, which authorized a plaintiff to sue in any district where a defendant may be found or transacts business does not mean—as Pavlovich erroneously asserts—"the district court may not dismiss a case for refiling in a foreign country." *Id.* at 661-62 (citing 15 U.S.C. § 22). Similarly, in *Capital Currency Exchange v. National Westminster Bank PLC*, 155 F.3d 603 (2d Cir. 1998), the Second Circuit affirmed an order that dismissed an antitrust complaint on the basis of *forum non conveniens* because England was a more appropriate forum than the United States. And in *In re Volkswagen AG*, No. 23-40487, 2023 U.S. App. LEXIS 31195 (5th Cir. Nov. 21, 2023), the Fifth Circuit went

so far as to order mandamus relief and direct the district court to consider dismissal on the basis of *forum non conveniens*. *See id.* at \*5-8 (vacating decision by district court in which it improperly "declined to conduct a forum non conveniens analysis" and ordering "new determination under a *forum non conveniens* framework").[6]

In any event, whatever *National City I* may have meant for antitrust cases, it is no longer good law. In *Howe*, this Court recounted the relevant history as follows:

> [I]mmediately after the Supreme Court decided *National City Line I*, Congress enacted a new statute, 28 U.S.C. § 1404(a), that explicitly permitted domestic transfers of cases to more convenient forums. And the very next year, the

---

[6] Without any analysis, Pavlovich cites *La Seguridad v. Transytur Line*, 707 F.2d 1304 (11th Cir. 1983). Br. 18. That decision did not hold the doctrine of *forum non conveniens* was inapplicable to the international contract dispute. Instead, it concluded the district court misapplied the doctrine by failing to properly balance the private and public factors. *See id.* at 1308 (holding "the district court abuses its discretion when it fails to balance the relevant factors"). Leaving no doubt, the Eleventh Circuit also stated: "We do not foreclose a dismissal on *forum non conveniens* grounds once the issues have been clearly delineated." *Id.* at 1309-10 (acknowledging possibility that district court might dismiss action in United States in favor of litigation in Venezuela). Further, to the extent footnote 10 in *La Seguridad* addressed *National City Lines I* or sought to apply that antitrust precedent to Jones Act claims, its discussion is difficult, if not impossible, to square with *National City Lines II* and *Howe*.

17

> Supreme Court simply *overruled National City Lines I.*

*Id.* at 949 (citing *United States v. Nat'l City Lines*, 337 U.S. 78, 84 (1949) ("*National City Lines II*")) (emphasis in original); *see Cap. Currency Exch.*, 155 F.3d at 608 (following *Howe* and affirming dismissal on the basis of *forum non conveniens*).

Contrary to Pavlovich's position in this appeal, this Court "found no good policy reason for reading the special venue provisions [in federal statutes] as if someone in Congress really intended them to remove the courts' legal power to invoke the doctrine of *forum non conveniens* in an otherwise appropriate case." *Howe*, 946 F.2d at 950.

> To insist that American courts hear cases where the balance of convenience and the interests of justice require that they be brought elsewhere will simply encourage an international forum-shopping that would increase the likelihood that decisions made in one country will cause (through lack of awareness or understanding) adverse effects in another, eroding uniformity or thwarting the aims of law and policy. And, to deprive American courts of their transfer power, when, but only when, one or more of more than three hundred special venue statutes applies, would create hodge-podge, that would, or would not, bring about an American adjudication of an essentially foreign controversy, depending upon the pure happenstance of whether Congress—at some perhaps distant period and likely out of a

18

> desire to widen plaintiffs' venue choices in typical domestic cases—enacted a "special venue" provision. Such a result would seem thoroughly unsound.

*Id.* (internal citation omitted).

Moreover, the policy concerns that animated *National City Lines I*, before the Supreme Court overruled it, are not present here. That case involved sprawling antitrust litigation in which the defendants were "numerous companies widely scattered in the location of their places of incorporation, principal offices, and places of carrying on business and participating in the scheme." *Id.* at 591. Therefore, "the practical result" of permitting each defendant to move for dismissal on the basis of *forum non conveniens* in each successive district where the case might be filed (or re-filed) "well might be to establish a merry-go-round of litigation upon the issue, which could be used to defer indefinitely consideration of the merits." *Id.* at 591-92. In contrast here, there is only one defendant— Ms. Palmer—and she (like Gaiman) has consented to jurisdiction and agreed to accept lawful process in New Zealand. Thus, if Pavlovich chooses to re-file a claim in New Zealand, the case could proceed there without further delay.

19

Ironically, Pavlovich's argument about *National City Lines I* disregards the central thrust of the Supreme Court's decision. In recounting the history of special venue provisions in the securities laws, the Court noted that the purpose was "to give the plaintiff the right to bring suit and have it tried in the district where the defendant had committed violations of the Act and inflicted the forbidden injuries." 334 U.S. at 583; *see id.* at 588 (explaining concern that defendants might "claim[] immunity from suit in the districts where by a course of conduct, they had violated the Act with the resulting outlawed consequences"). Here, Pavlovich advocates for the opposite result:  she wants to sue Ms. Palmer in the United States, even though she claims that all the TVPA violations occurred in New Zealand.

None of the other cases that Pavlovich cites in passing support her argument that the doctrine of *forum non conveniens* is inapplicable to TVPA claims—or for that matter, to any other federal claims under the many statutes that include special venue provisions.

It is not entirely clear what "principle" Pavlovich claims *American Dredging Co. v. Miller*, 510 U.S. 443 (1994), "reinforced" or how it "emphasized the importance of respecting Congress's specific venue

20

choices," because she addresses the complicated admiralty decision in a single vague sentence. Br. 17-18. To be sure, *American Dredging* said nothing about the TVPA. Nor did it hold that a specific venue provision, like the one in the TVPA, completely displaces the doctrine of *forum non conveniens*, as Pavlovich incorrectly contends. *American Dredging* held only that a Jones Act claim brought in Louisiana state court was not subject to a *forum non conveniens* dismissal because Louisiana state law expressly forecloses that result and because federal maritime law does not preempt that state procedural choice. Far from casting doubt on the application of the doctrine *of forum non conveniens* in this case, *American Dredging* affirmed that it applies—and permits dismissal—"even if jurisdiction and venue are established" in federal court. *Id.* at 447-48.

Meanwhile, *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000), which Pavlovich cites for differed point, Br. 22, directly refutes Pavlovich's *forum non conveniens* argument. In allowing Alien Tort Claims Act claims under 28 U.S.C. § 1350 to proceed in federal court in New York against foreign corporations in Nigeria, the Second Circuit

held that the Torture Victims Protection Act[7] had not "nullified, or even significantly diminished, the doctrine of *forum non conveniens.*" *Id.* at 106. The court vacated the dismissal, not because the *forum non conveniens* doctrine did not apply, but rather because the district court abused its discretion in "balancing the competing interests." *Id.* at 99.

## IV. The District Court did not abuse its discretion in dismissing Pavlovich's claims on the basis of *forum non conveniens.*

The District Court clearly applied the proper legal framework and carefully considered all the relevant public and private factors. It neither committed any legal error nor abused its discretion in any way.

### A. The District Court properly applied the well-established *forum non conveniens* framework.

In summarizing the applicable legal standard, the District Court correctly summarized the law in this Circuit.

> *Forum non conveniens* is a discretionary defense that empowers a district court to dismiss an action

---

[7] Although the Torture Victims Protection Act of 1991 and the Trafficking Victims Protection Act of 2002 are both sometimes referred to as "the TVPA," they are different federal statutes. The former authorizes private individuals to sue foreign officials for torture and extrajudicial killing; the latter addresses problems of slavery, sex trafficking, and forced labor through a variety of criminal and civil provisions. To the extent that the Torture law did not nullify the *forum non conveniens doctrine* where plaintiffs cannot plausibly seek relief in the places where they suffered torture, *a fortiori* the later Trafficking law did not affect, *sub silentio*, that dramatic result.

> when a court abroad is the more appropriate and convenient forum. Although a plaintiff's chosen forum is entitled to deference, that presumption applies with less force when the plaintiff's choice is not her home forum.

A34 (citing *Sysco Mach. Corp.*, 124 F.3d at 37).

Further, in identifying the burdens of proof, the District Court correctly noted the "twofold" burden on the party moving for dismissal.

> The moving party's burden is twofold: it must establish that (1) an adequate alternative forum is available and (2) considerations of convenience and judicial efficiency strongly favor litigating the claim in that alternative forum.

A34 (citing *Adelson v. Hananel*, 510 F.3d 43, 52 (1st Cir. 2007)).

The District Court went on to accurately define the "two requirements" of an "adequate forum."

> An adequate forum must meet two requirements: (1) all parties are subject to the forum's jurisdiction, and (2) the parties will not be deprived of all remedies or treated unfairly, even though they may not enjoy the same benefits as they might receive in an American court.

> The first requirement (the forum's "availability") is typically satisfied if the defendant is amenable to service of process there. As to the second requirement (the forum's "adequacy"), an alternative forum in adequate unless the remedy it provides "is so clearly inadequate or unsatisfactory that it is no remedy at all."

A34-35 (quoting *Imamura*, 957 F.3d at 106).

It also correctly identified "the compendium of factors relevant to the private and public interests implicated by the case." A35.

> [The r]elevant private interest factors include
>
> the relative ease of access to sources of proof; availability [and cost] of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . and all other practical problems that make trial of a case easy, expeditious[,] and inexpensive.
>
> The relevant public interest factors include
>
> the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

A35 (quoting *Imamura*, 957 F.3d at 106) (second and third alterations in District Court's Mem. and Order).

Pavlovich does not contend that the District Court misstated any aspect of the applicable law, nor could she. Instead, she argues only that the District Court struck the wrong balance. But she cannot satisfy her

24

"formidable burden" to show that the District Court erred in exercising its broad discretion. *Sysco Mach. Corp.*, 124 F.4th at 37.

### B. The District Court gave appropriate deference to Pavlovich's strategic decision to sue in a foreign forum rather than her home forum.

As an initial matter, Pavlovich concedes, as she must, that any deference due to her choice of forum is "reduced" because she did *not* choose her "home forum" of New Zealand. Br. 20-21. Such deference is at its nadir where, as in this case, the plaintiff is a citizen of country A, resides in country B, but sues in country C. *See Wiwa*, 226 F.3d at 103; *see generally Adelson*, 510 F.3d at 53 (holding a plaintiff's choice of forum deserves "some degree of deference," but only a plaintiff's choice of her home forum is entitled to "heightened deference").[8]

As the District Court correctly found, A31, 38-39, and as Pavlovich acknowledges, Br. viii, 3, 25, she is a citizen of New Zealand and resides in Scotland. Despite those facts, Pavlovich brought her claim against Ms. Palmer in the United States. As the District Court also correctly

---

[8] Unlike Pavlovich, the *Wiwa* plaintiffs were U.S. residents who had no meaningful opportunity to litigate their torture claims in their home country, Nigeria, for fear of that they would suffer further abuse and retribution by local officials.

observed, her strategic decision is entitled to some deference but not any special consideration. A34; *see Pavlovich*, 2006 U.S. App. LEXIS 18866, at *8-9 (giving Pavlovich's "preference" of a U.S. forum "only marginal weight," because "when a foreign plaintiff sues a U.S. resident, the presumption becomes 'little more than a tie breaker'").[9]

### C.    The District Court reasonably concluded that New Zealand is an available, adequate forum.

Pavlovich concedes that New Zealand is "available" (because Ms. Palmer, like Gaiman, has consented to jurisdiction and service of process there), and the District Court correctly found that New Zealand is also "adequate." A36-38. An inadequate forum is one where a plaintiff would

---

[9] Pavlovich cites *Sysco Machinery* for the proposition that her choice of a foreign forum "remains entitled to considerable weight." Br. 20. But her argument mischaracterizes this Court's decision, and it typifies the casual manner in which she makes use of precedent. Neither at page 37, nor anywhere else, does the decision say that a plaintiff's choice of a foreign forum is due "considerable weight." That phrase does not appear in the decision, which holds, "[w]hen the plaintiff's choice is not its home forum, . . . the presumption in the plaintiff's favor 'applies with less force.'" 124 F.4th at 37 (quoting *Sinochem Int'l Co.*, 549 U.S. at 430 (quoting *Piper Aircraft Co.*, 454 U.S. at 255)). Pavlovich fails to explain how she gets from "less force" to "considerable weight." Moreover, she ignores the salient fact that, in *Sysco Machinery*, the plaintiff chose to bring its IP claims in the United States, and despite that choice, this Court affirmed the dismissal in favor of litigation in Taiwan, where the relevant events "largely" occurred.

be entitled to "no remedy at all." *Imamura*, 957 F.3d at 112; *see Curtis v. Galakatos*, 19 F.4th 41, 49 (1st Cir. 2021) (holding inadequate forum is one where plaintiff would be "deprived of all remedies"). And Pavlovich's unsupported assertion that she could obtain "no remedy" in New Zealand is plainly incorrect.

As the Seventh Circuit held: "even assuming Pavlovich cannot get any compensatory damages under New Zealand's unique compensation structure, nor obtain [mental health] treatment through that structure [while she continues to live in Scotland], punitive damages would provide her at least *some remedy*." 2026 U.S. App. LEXIS 18866, at *7 (emphasis added); *see id.* ("Regardless of their 'purpose,' punitive damages are a remedy available to Pavlovich in New Zealand.").

Not surprisingly, on appeal, Pavlovich has failed to cite any cases, from this Circuit or elsewhere, in which any court has concluded New Zealand is not an "adequate forum" for a wide range of potential claims, including tort claims for alleged personal injuries.

Pavlovich had also failed to cite, much less to distinguish, the many cases—in addition to the recent decision by the Seventh Circuit—in which courts have looked favorably on New Zealand as a foreign forum.

*See Lueck v. Sundstrand Corp.*, 236 F.3d 1137 (9th Cir. 2011) (affirming dismissal on basis of *forum non conveniens* of wrongful death and personal injury claims arising from airplane crash in New Zealand); *Flack v. Nutribullet, LLC*, No. 2:18-cv-05829-DDP, 2018 U.S. Dist. LEXIS 205356, at *7 (C.D. Cal. Dec. 4. 2018) (ruling New Zealand was adequate alternative forum, but denying motion to dismiss for *forum non conveniens* because California had strong local interest in products liability claims involving products that California companies designed in California); *Solvander v. Am. Med. Sys.*, MDL No. 2325, No. 2:13-cv-19418, 2014 U.S. Dist. LEXIS 19870, at *6-8 (S.D.W.V. Feb. 18, 2014) (dismissing product liability claims for *forum non conveniens* where plaintiffs used products and received medical care in New Zealand); *Intec USA LLC v. Engle*, No. 05-C-6171, 2005 U.S. Dist. LEXIS 33365, at *6-7 (N.D. Ill. Dec. 13, 2005) (dismissing tort and contract claims for *forum non convenience* and noting courts in the United States have "repeatedly . . . found" New Zealand to be an "adequate forum" to address a wide range of legal claims); *In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 887 F. Supp. 1469 (N.D. Ala. 1995) (dismissing wrongful death and personal injury claims for *forum non conveniens* and ruling "[f]or those .

28

. . who can use the court system or pursue administrative remedies in New Zealand, . . . an alternative forum does exist"); *Stonehill v. Int'l Harvester Co.*, 132 Ill. App. 3d 1043 (Ill. App. Ct. 1985) (reversing denial of motion to dismiss for *forum non conveniens* and remanding wrongful death claim arising from fatal tractor accident in New Zealand).

Against that backdrop, the District Court did not abuse its considerable discretion in finding that New Zealand offered "some remedy" to Pavlovich, even if not the specific type of remedy that she may prefer. The District Court correctly found that, before she left New Zealand, Pavlovich had received a "remedy for her mental injuries" in the form of "government-sponsored therapy." A37-38. Pavlovich does not dispute that she could obtain additional therapy, at no cost, if she returns to her home country. The District Court reasonably concluded such an available remedy is sufficient, "[g]iven that a compensatory damages award," which Pavlovich seeks in the United States, "would presumably be used to pay for that kind of treatment," which Pavlovich has received for free, and could continue to receive, through the legal system in New Zealand. A37-38.

The District Court also found that Pavlovich could seek further remedies in New Zealand, beyond government-funded treatment for any mental injuries, including "exemplary damages for egregious conduct." A37. Such damages further demonstrate that additional remedies "beyond the ACC" are available to Pavlovich in New Zealand, and thus, New Zealand is an adequate forum for her claims. A37.

On appeal, Pavlovich speculates that exemplary damages in New Zealand—which she analogizes to punitive damages in the U.S.—would only be available against Gaiman, because Pavlovich alleges that only Gaiman, and not Ms. Palmer, raped her. Br. 30. There are several problems with that mistaken contention. First, Pavlovich seeks to hold Gaiman *and Ms. Palmer* jointly liable for his alleged sexual misconduct. The very first paragraph of her complaint alleges (falsely) that Ms. Palmer played a "role in procuring and presenting [her] to Gaiman for such abuse," A4 (¶ 1), and she asserts a negligence claim that seeks to hold Ms. Palmer financially liable as the proximate cause of Pavlovich's injuries at Gaiman's hands, A26-28 (¶¶ 309-327) (alleging that Ms. Palmer negligently "introduce[d]" Pavlovich to Gaiman and negligently "fail[ed] to warn" her of the "unreasonable danger" that he posed).

Second, Pavlovich conceded below, in the context of her claims *against Ms. Palmer*, that New Zealand law permits an alleged victim of "sexual abuse" to sue for "limited damages." D.E. 22 at 10. Third, Ms. Palmer presented an expert affidavit to the District Court that confirmed the availability of exemplary damages in New Zealand. D.E. 28-1.

### D. The District Court reasonably weighed the public factors which favor New Zealand.

With regard to the public factors, the District Court found that "New Zealand has a greater interest in deciding this case." A41 (citing decision in *Pavlovich v. Gaiman*). The District Court did not abuse its discretion in concluding that New Zealand was the "more interested forum" concerning claims that Pavlovich, a citizen of New Zealand, was sexually assaulted by Gaiman, a legal resident of New Zealand, while she was living and working in New Zealand. A41.

Again, as the Seventh Circuit held, the sensible conclusion that "New Zealand has a stronger connection to this dispute," arising from the alleged sexual abuse of a New Zealand citizen by a New Zealand resident in New Zealand, was not an abuse of discretion. 2026 U.S. App. LEXIS 18866, at *4-5.

31

The civil remedy provision of the TVPA does not dictate a different result. As discussed below, absent a clear statement from Congress or applicable precedent from this Court, the District Court properly rejected Pavlovich's erroneous contention about the extraterritorial application of TVPA's civil-remedies provision. *See* Argument, V, *infra.* Regardless, for the purposes of *forum non conveniens* analysis, the District Court also made clear that, even if the TVPA authorized Pavlovich's claims concerning alleged sexual misconduct in New Zealand, the public factors—along with common sense—would still favor New Zealand as the most appropriate forum for this foreign dispute. A40-41.

The Seventh Circuit reached the same well-reasoned result: "even assuming the civil-remedy provision [of the TVPA] applies extraterritorially, we hold the district court did not abuse its discretion in concluding New Zealand has a stronger connection to this dispute." 2006 U.S. App. LEXIS 18866, at *14.[10]

---

[10] The Seventh Circuit reasoned that even if the United States has an interest in providing a forum to civil plaintiffs to assert claims under the TVPA, New Zealand has a competing—and stronger—"public-policy prerogative" in "[e]nacting and enforcing" its "unique accident-compensation scheme." 2026 U.S. App. LEXIS 18866, at *6-7, *13-14.

In trumpeting the "policy" that supposedly animated the TVPA, Pavlovich relies heavily on *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88 (2d Cir. 2000). But she misreads that precedent. To the extent that *Wiwa* endorsed a "policy" in favor of U.S. courts exercising their statutory jurisdiction to hear torture claims arising from foreign conduct, Pavlovich disregards what made that ATCA case—and all cases of alleged torture *by foreign officials*—different from this one.

Noting that the plaintiffs alleged abuse, including kidnapping, torture, and murder in Nigeria that had been "carried out by the Nigerian government and military" at the behest of the defendant corporations, the Second Circuit explained the special challenges that ATCA plaintiffs often confront in foreign forums where their alleged torture occurred.

> One of the difficulties that confront victims of torture under color of a nation's laws is the enormous difficulty of bringing suits to vindicate such abuses. *Most likely, the victims cannot sue in the place where the torture occurred.* Indeed, in many instances, the victim would be endangered merely by returning to that place. It is not easy to bring such suits in the courts of another nation. Courts are often inhospitable. Such suits are generally time consuming, burdensome, and difficult to administer. In addition, because they assert outrageous conduct on the part of another nation, such suits may embarrass the government of the nation in whose courts they are brought.

226 F.3d at 106 (emphasis added).[11]

That is not this case, however. Pavlovich is a citizen of New Zealand, and there is no evidence that Pavlovich cannot go home, that she would face any danger in New Zealand, or that the country (or its courts) would be inhospitable to her. To the contrary, as discussed below, New Zealand has a powerful interest in fairly and fully adjudicating a private civil dispute in which a citizen of New Zealand claims to have been sexually assaulted in New Zealand by a person who was, at the time, a legal resident of New Zealand. This case more closely resembles *Piper*

---

[11] *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289 (S.D.N.Y. 2003), another ATCA case on which Pavlovich mistakenly relies, followed *Wiwa* and made the same critical point in even more vivid language. Denying the defendants' motion to dismiss, the court noted that the plaintiffs alleged Talisman had acted under color of law in participating with Sudanese officials in ethnic cleaning, genocide, and other war crimes. *See id.* at 328. Given those allegations, the court found that Sudan was not an adequate, alternative forum: "It would be rather surprising if the government of Sudan conducted a war of 'ethnic cleansing' against plaintiffs and at the same time granted them a fair judicial process to remedy those injuries. In addition, it would be perverse, to say the least, to require plaintiffs to bring this suit in the courts of the very nation that has allegedly been conducting genocidal activities to try to eliminate them." *Id.* at 336 (citing *Wiwa*); *see also id.* (ruling that it is an "almost self-evident fact" that Sudan is not "an appropriate forum under *forum non conveniens* analysis," because "plaintiffs would be unable to obtain justice in Sudan and might well expose themselves to great danger in trying to do so").

34

(holding Scotland, the site of a plane crash, was the more appropriate forum for tort claims) than *Wiwa*, because "there is an obviously better suited foreign forum for the adjudication of the dispute." *Wiwa*, 266 F.3d at 107.[12]

While narrowly focusing on the U.S. interest in TVPA claims, Pavlovich completely ignores the more obvious and much stronger local interest of foreign courts in tort claims arising from events in their own countries, including alleged misconduct by their residents against their citizens. For example, in *Lueck*, the court recognized "the interest of New Zealand" regarding civil claims arising from a fatal airplane crash in New

---

[12] Pavlovich's reliance on *In re Air Crash Disaster Near New Orleans, La.*, 821 F.2d 1147, 1165 (5th Cir. 1987) (*en banc*), is perplexing at best. Br. 22. *Air Crash* was *not* a TVPA case. It was a class action arising from a fatal airplane crash near New Orleans. Among the victims were citizens of Uruguay on vacation in the United States, and the plaintiffs included their relatives who sued numerous defendants for damages. Pan Am moved to dismiss on the basis of *forum non conveniens*, arguing that damages litigation should proceed in Uruguay. The district court denied the motion, and after trial, the Fifth Circuit affirmed. The appeals court noted, among other reasons, that the United States itself was a defendant and that "no other forum," including Uruguay, "could entertain the plaintiffs' actions against all of the defendants," and thus, "no alternative forum was available." *Id.* at 1168. The decision, which says nothing about the "remedial purpose" of any federal statute, does *not* include the quoted language that appears in Pavlovich's brief. Indeed, research does not reveal any reported case that includes that language.

Zealand was "extremely high." 236 F.3d at 1137; *see also Intec USA*, 2005 U.S. Dist. LEXIS 33365, at \*13 (ruling "New Zealand has a strong interest in regulating purported misconduct committed by its residents").

U.S. courts routinely apply that familiar principle and defer to the stronger interests of foreign courts in cases about alleged sexual assaults abroad. *See, e.g.*, *S.R.J. v. Marriott Int'l, Inc.*, No. 2:21-cv-1863, 2022 U.S. Dist. LEXIS 191019, at \*15-16 (W.D. Pa. Oct. 19, 2022) (ruling Mexico had "overwhelming interest" in civil claims arising from alleged sexual assault by citizen of Mexico at resort in Mexico); *Jane Doe L.C. v. Aimbridge Hosp., LLC*, No. 19-cv-1762 (MN), 2020 U.S. Dist. LEXIS 172336, at \*10-11 (D. Del. Sept. 21, 2020) (ruling "[p]ublic interest regarding the resolution of this incident [*i.e.*, alleged sexual assault] inures to the setting in which the alleged incident took place – Jamaica"). Pavlovich has not addressed, much less distinguished, these clear and relevant precedents.

## E. The District Court reasonably weighed the private factors which also favor New Zealand.

As to the private factors, the District Court found that they, too, "tilt in favor of dismissal." A38-39. Far from an abuse of discretion, that decision was eminently reasonable, because New Zealand is the *only*

36

jurisdiction in which all three parties (Pavlovich, Gaiman, and Ms. Palmer) are amendable to process and have consented to jurisdiction. *See Pavlovich*, 2026 U.S. App. LEXIS 18866, at *9-10 (emphasizing the critical fact that New Zealand is the only forum where both Ms. Palmer and Gaiman would be subject to process, because they have both consented to jurisdiction there).[13]

Moreover, every other conceivable witness to Gaiman's alleged assaults, Ms. Palmer's alleged conduct, or Pavlovich's claimed injuries would be available in New Zealand, because that is where *all the alleged events* occurred. Both below and on appeal, Pavlovich has never identified a single material witness (other than Ms. Palmer) or a single significant piece of evidence that might be found in Massachusetts or would only be available here.

---

[13] Pavlovich sued Gaiman in Wisconsin, where he lives part time, and Ms. Palmer in Massachusetts, where she lives part time. Gaiman is not a party to this case, and he is beyond the subpoena power of the District Court here. Similarly, Ms. Palmer is not a party to the Wisconsin action, and she is beyond the subpoena power of the federal court there. As a result, allowing Pavlovich to proceed in the United States would have involved parallel, duplicative actions, which would waste significant resources and risk inconsistent results, an outcome that both federal courts wisely rejected.

Given those facts, the District Court was not convinced by Pavlovich's assertion that travel from the United Kingdom to the United States is significantly more convenient than travel from the United Kingdom to New Zealand. It is not for this Court to second-guess that decision, which was certainly no abuse of discretion.

Regarding these "private factors," and rejecting Pavlovich's same arguments, the Seventh Circuit held the district court did not abuse its discretion in finding "New Zealand offer better access to evidence than the United States" about Pavlovich's claims, including her alleged damages related to psychological injuries for which she previously received treatment in New Zealand. 2026 U.S. App. LEXIS 18866, at *10.

## V. The District Court correctly concluded the TVPA does not authorize civil claims by foreign plaintiffs arising from alleged foreign conduct.

This Court need not decide whether the civil-remedies provision of the TVPA applies to foreign conduct, because even if the TVPA could be read to permit Pavlovich to sue in the United States for claims arising from Gaiman's alleged sexual assaults in New Zealand, dismissal on the basis of the *forum non conveniens* would still be appropriate. Nevertheless, Pavlovich misreads the TVPA, which gives no clear

indication that Congress intended to transform local police matters from around the world into the potential subjects of private litigation in the federal courts of the United States. Accordingly, this Court could affirm dismissal on that alternative basis.

## A. Federal statutes must be read with a presumption against extraterritoriality.

"Courts presume that federal statutes 'apply only within the territorial jurisdiction of the United States.'" *WesternGeco LLC v. ION Geophysical Corp.*, 585 U.S. 407, 412 (2018) (quoting *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949)); *see Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454 (2007) ("United States law governs domestically but does not rule the world."). "This rule, commonly called the presumption against extraterritoriality, is a 'canon of construction' that guides [the] interpretation of federal statutes." *Estados Unidos Mexicanos v. Smith & Wesson Brands, Inc.*, 91 F.4th 511, 518 (1st Cir. 2024) (citing *Yegiazaryan v. Smagin*, 599 U.S. 533, 541 (2023)); *see also Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010) (explaining question is not whether courts think "Congress would have wanted" statute to apply to foreign conduct "if it had thought of the situation [in a particular case]," but

39

whether Congress has "affirmatively and unmistakably instructed that the statute will do so").

The presumption against the extraterritorial application of federal statutes, such as the TVPA, "reflects concerns of international comity insofar as it 'serves to protect against unintended clashes between our laws and those of other nations which could result in international discord.'" *Estados Unidos Mexicanos*, 91 F.4th at 518 (quoting *Kiobel v. Royal Dutch Petro. Co.*, 569 U.S. 108, 115 (2013)). It also "embodies 'the commonsense notion that Congress generally legislates with domestic concerns in mind.'" *Id.* (quoting *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993)). Thus, courts "construe federal laws 'to have only domestic application' unless [they] find 'clearly expressed congressional intent to the contrary.'" *Id.* (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 335 (2016)); *see also Morrison*, 561 U.S. at 335 ("When a statute gives no clear indication of an extraterritorial application, it has none.").

*RJR Nabisco, Inc. v. European Community*, 579 U.S. 325 (2016), a civil RICO case concerning foreign conduct, provides the applicable legal framework for assessing the extraterritorial application of a particular statute. In that case, the European Community alleged RJR Nabisco

"participated in a global money-laundering scheme in association with various organized crime groups." *Id.* at 332. The "pattern of racketeering activity" included "money laundering, material support for foreign terrorist organizations, mail fraud, wire fraud, and violations of the Travel Act." *Id.* To answer "the question of RICO's extraterritorial application," the Supreme Court first considered whether RICO's criminal prohibitions (18 U.S.C. § 1962) apply to conduct in foreign countries, and it then considered whether its civil remedies (§1964(c)) authorize private plaintiffs to bring civil actions seeking damages for their alleged injuries caused by violations of the criminal prohibitions in foreign countries.

Carefully parsing RICO's statutory provisions, the Supreme Court held that § 1962 applies to foreign racketeering activity "but only to [an] extent"—that is, RICO's criminal prohibitions reach abroad only when the predicate offenses involve foreign conduct, such as international money laundering or assassinating government officials in foreign countries. *Id.* at 338-39; *see also id.* (clarifying that "[t]he inclusion of *some* extraterritorial predicates does not mean that *all* RICO predicates extend to foreign conduct" and "emphasiz[ing]" that "important

41

limitation" to RICO's extraterritorial reach) (emphasis in original). Turning to the private right of action, the Supreme Court concluded: "Irrespective of any extraterritorial application of § 1962, . . . § 1964(c) does not overcome the presumption against extraterritoriality." *Id.* at 346; *see also id.* at 349 ("Nothing in 1964(c) provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States."). To state a viable civil RICO claim, therefore, a plaintiff must adequately allege a "*domestic* injury." *Id.* at 346 (emphasis in original).

As the Supreme Court explained, the extraterritorial application of federal statutes that authorize *private claims* raises even more serious concerns about foreign policy and international comity than the extraterritorial application of laws that establish *criminal penalties*.

> "The creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004). Thus, as we have observed in other contexts, providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct. *See, e.g., Koibel,* [569 U.S.]

at 117 ("Each of th[e] decisions" involved in
defining a cause of action based on "conduct within
the territory of another sovereign" "carries with it
significant foreign policy implications").

*Id.* at 347; *see also id.* at 348 (recognizing "potential for international controversy that militates against recognizing foreign-injury claims without clear direction from Congress").

## B. The civil-remedies provision of the TVPA does not expressly provide for extraterritorial application.

Sections 1589 and 1591 establish criminal prohibitions on "forced labor" and "sex trafficking," respectively. 18 U.S.C. §§ 1589, 1591.

Section 1595, titled "Civil Remedy," provides a private cause of action for an individual who is made to provide forced labor in violation of § 1589 or is a victim of sex trafficking in violation of § 1591.

> An individual who is a victim of a violation of this chapter [18 U.S.C. § 1581 *et seq.*] may bring a civil action against the perpetrator (or whoever knowingly benefits, or attempts or conspires to benefit, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter [18 U.S.C. § 1581 *et seq.*]) in an appropriate district court of the United States and may recover damages and reasonable attorneys' fees.

18 U.S.C. § 1595(a).

43

Section 1596 provides for extraterritorial jurisdiction for "certain trafficking offenses."

> In addition to any domestic or extra-territorial jurisdiction otherwise provided by law, the courts of the United States have extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit an offense) under section 1581, 1583, 1584, 1589, 1590, or 1591.

*Id.* § 1596(a). By its terms, that extraterritorial-jurisdiction provision references the various criminal prohibitions against peonage, slavery, involuntary servitude, forced labor, and sex trafficking, but it does *not* reference § 1595, the civil-remedy provision.

By its notable silence, § 1595 speaks volumes about its limited application to domestic concerns, not alleged foreign conduct. *See Xu Lun v. Milwaukee Elec. Tool Corp.*, No. 24-cv-0803-bhl, 2025 U.S. Dist. LEXIS 233614, at *33 (E.D. Wisc. Dec. 1, 2025) (ruling "Section 1595 itself does not overcome the presumption [against extraterritoriality]," because "Section 1595 provides that victims of violations of the TVPA may bring a civil action against the perpetrator (or those who knowingly benefit from the violation), but it says nothing regarding extraterritorial application"); *Doe v. Apple, Inc.*, No. 1:19-cv-03737 (CJN), 2021 U.S. Dist. LEXIS 237710, *39 (D.D.C. Nov. 2, 2021) (citing *Doe v. Nestle USA, S.A.*,

44

929 F.3d 623, 632-34 (9th Cir. 2021)) (ruling TVPA's civil-remedies provision "says nothing about extraterritorial application," and "[t]hus, standing alone, it does nothing to rebut the rebut the presumption that it applies only domestically").

Indeed, nothing in the TVPA expressly provides that, under § 1595, a private plaintiff may bring a civil action for violations of the criminal prohibitions arising from alleged conduct between foreign individuals in foreign countries.

### C. Congress has made no clear, affirmative statement that the civil-remedies provision reaches alleged foreign conduct.

Because the TVPA does *not* expressly provide for the extraterritorial application of its civil-remedies provision, Pavlovich must prove that Congress clearly intended to open U.S. courts to private plaintiffs from around the world.

Under the *RJR Nabisco* framework, Pavlovich must show that Congress intended to authorize a citizen of New Zealand to sue a citizen of the United Kingdom for an alleged sexual assault in New Zealand in a federal court in the United States. *See Estados Unidos Mexicanos*, 91 F.4th at 519 (following *RJR Nabisco* and applying its "two-step process").

45

At the first step, the question is "whether the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco, Inc.*, 579 U.S. at 337. If not, at the second step, the question is whether "the case involves a domestic application of the statute." *Id.* This process applies "regardless of whether the statute in question regulates conduct, affords relief, or merely confers jurisdiction." *Id.* at 337.

Pavlovich does not contend, nor could she show, that at the "second step," her civil claims involve a "domestic application" of the TVPA. *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 418 (2023) ("[T]o prove that a claim involves a domestic application of a statute, plaintiff must establish that the *conduct relevant to the statute's focus* occurred in the United States.") (emphasis in original). In this case, the complaint only alleges actions taken and injuries suffered in New Zealand, not in the United States.[14] Accordingly, at the "first step," she must prove the TVPA provides a "clear, affirmative indication" that Congress intended the statute's civil-remedies provision (§ 1595) to

---

[14] To be clear, all the claims in this case arise from alleged events that occurred in—and only in—New Zealand. Pavlovich does not allege, for example, that she was "trafficked" across any international border or that any "transnational" conduct violated the TVPA, much less that anything at all occurred in the United States.

authorize private claims concerning alleged violations in foreign countries. But Congress made no such "unmistakabl[e]" statement. *Morrison*, 561 U.S. at 255.

By its terms, and despite its numerous amendments, the TVPA does not expressly provide for extraterritorial application of its civil-remedies provision.

> Since *RJR Nabisco*, Congress has twice amended Section 1595—once in 2018 and again in 2023. Despite this, Congress did not add any language regarding extraterritorial application of Section 1595. Nor has Congress amended Section 1596 since its enactment in 2008 to give extraterritorial effect to Section 1595. Congress's inaction appears to be a deliberate decision . . . . that Section 1595 applies only to domestic conduct.

*Xu Lun*, 2025 U.S. Dist. LEXIS 233614, at *37 (citations omitted).

Nor does the broader context of the TVPA alter the straightforward reading of the statutory text. Although § 1596 "grants extraterritorial application to many criminal statutes," such as § 1589, § 1590, and § 1591, "it does not mention their civil analogue, § 1595." *Doe v. Apple, Inc.*, 2021 U.S. Dist. LEXIS 237710, at *40. Instead, the text and structure of § 1596 confirm that Congress was "focused on criminal, not civil, applications" of the TPVA. *Id.* (explaining "criminal focus" of § 1596,

47

which "makes no mention of civil suits"). The extraterritorial-jurisdiction provision applies only to "certain trafficking offenses," referring the criminal prohibitions in the referenced sections.

Like RICO, the TVPA both establishes criminal prohibitions and provides civil remedies. Focusing on the specific claims asserted in this case, § 1589 prohibits "forced labor"; § 1590 prohibits "trafficking with respect to peonage, slavery, involuntary servitude, or forced labor"; § 1591 prohibits "sex trafficking . . . by force, fraud or coercion"; and § 1594 prohibits attempting or conspiring to violate §§ 1589, 1590, 1591 and other sections not relevant here. These substantive provisions, which Congress enacted in 2000 as part of the original version of the TVPA, establish federal crimes and authorize severe punishments, including lengthy terms of incarceration. *See, e.g.*, *id.* § 1589(d) (setting maximum sentence of life imprisonment based on aggravating factors). In addition to these criminal prohibitions, § 1595, which Congress added in 2003, provides for civil remedies, permitting "[a]n individual who is a victim of a violation of this chapter [18 U.S.C. § 1581 *et seq*.]" to bring a civil action against the primary perpetrator and, in certain limited circumstances, a secondary beneficiary. Finally, § 1596, which Congress added in 2008,

48

provides "[a]dditional jurisdiction in certain trafficking offenses." It states that federal courts have "extra-territorial jurisdiction over any offense (or any attempt or conspiracy to commit any offense) under section . . . 1589, 1590, or 1591," if the alleged offender is a U.S. national of or present in this country.

"When a statute provides for some extraterritorial application, the presumption against extraterritoriality operates to limit that provision to its terms." *Morrison*, 561 U.S. at 265. Here, Congress repeatedly amended the TVPA, and it "could have easily included § 1595 in § 1596, but it did not." *Doe v. Apple, Inc.*, 2021 U.S. Dist. LEXIS 237710, at *40. The conspicuous omission of any reference to the civil-remedies provision in the extraterritorial-jurisdiction provision is inconsistent with any "clear, affirmative indication" that Congress intended the TVPA's private right of action to reach alleged foreign actions or injuries. *RJR Nabisco*, 579 U.S. at 337.

Disregarding the statutory text and structure, Pavlovich insists that, by enacting the TPVA, Congress sought to address the worldwide problems of sex trafficking and forced labor. While that may be true, the

49

statute that Congress enacted says what it says and must be read according to the familiar rules of construction.

> Congress's intent to broadly address human trafficking and forced labor does not mean the TVPA must be applied without regard to its express limits or to established doctrines like the presumption against extraterritoriality. Indeed, the same argument [plaintiff] makes here could be made about RICO, a statute enacted to combat the major problem of criminal racketeering and organized crime. As *RJR Nabisco* shows, Congress's desire to attack a problem by criminalizing conduct, even conduct in foreign countries, does not mean that a corollary civil remedy must also apply to foreign conduct.

*Xu Lun*, 2025 U.S. Dist. LEXIS 233614, at \*36.

**D.    Although the courts are split, the better reasoned decisions have followed *RJR Nabisco* and rejected similar TVPA claims concerning foreign conduct.**

Only a handful of cases have addressed the extraterritorial application of the TVPA's civil-remedies provision, perhaps because few plaintiffs have attempted to sue in federal courts for sexual assaults and employment disputes that occurred in foreign countries. At least two recent decisions have dismissed civil claims against U.S. companies regarding alleged forced labor in foreign countries, ruling that the plaintiffs failed to overcome the presumption against the extraterritorial application of § 1595. *See Mia v. Kimberly-Clark Corp.*, No. 1:22-cv-02353

50

(CJN), 2025 U.S. Dist. LEXIS 42876 (D.D.C. Mar. 10, 2025) (dismissing civil TVPA claims); *Doe v. Apple, Inc.*, No. 1:19-cv-03737 (CJN), 2021 U.S. Dist. LEXIS 237710 (D.D.C. Nov. 2, 2021) (same); *but see United States ex rel. Hawkins v. ManTech Int'l Corp.*, 752 F. Supp. 3d 118 (D.D.C. 2024); *Abernathy v. Carlyle Grp., Inc.*, No. 22-cv-3602 (ABJ), 2024 U.S. Dist. LEXIS 237526 (D.D.C. Sept. 27, 2024) (companion case to *Hawkins*). Among the conflicting authorities, *Mia* and *Doe* are the better reasoned, more analogous decisions, and this Court should follow them.

For example, *Doe v. Apple* applied the extraterritoriality framework from *RJR Nabisco* and dismissed civil TVPA claims concerning forced labor in the Democratic Republic of Congo. The plaintiffs included children who suffered terrible injuries and parents of children who died while digging in foreign mines for cobalt to be used by U.S. companies in smart phones, electric cars, and other devices. The plaintiffs sought to hold the defendants, including Apple, Microsoft, and Tesla, liable for knowingly obtaining financial benefits from unlawful forced labor. The court dismissed their § 1595 claims on the ground that Congress did not clearly indicate that the TVPA's civil remedies reach the alleged conduct in the Congo.

51

> It . . . seems likely that when in § 1596(a), Congress granted extraterritorial jurisdiction over "any offense (or any attempt or conspiracy to commit an offense) under section, 1581, 1583, 1584, 1589, 1590, or 1591," its omission of § 1595 was not mistaken, but was an intentional decision not to extend extraterritorially the reach of the statute's civil component. It is not for this Court to question that decision; especially as grants of extraterritorial jurisdiction are fraught with international-relations considerations, ones far outside the judicial role.

*Id.* at *41-42 (citing *RJR Nabisco*, 579 U.S. at 347-48).[15] This Court should reach the same conclusion here, and on that basis, Pavlovich's TVPA claims should be dismissed.

*Roe v. Howard*, 917 F.3d 229 (4th Cir. 2019), the only appellate case to decide this issue, arose in a markedly different procedural posture, involved plainly distinguishable facts, and arguably misapplied the legal

---

[15] The D.C. Circuit affirmed the dismissal of the TVPA claims in *Doe*, holding the plaintiffs failed to adequately allege plausible claims that the defendants knowingly benefited from their participation in a venture that involved forced labor, and without deciding whether § 1595 applies to alleged foreign conduct that caused foreign injuries. *See Doe v. Apple, Inc.*, 96 F.4th 403, 414-16 (D.C. Cir. 2024). Since then, the district courts in the D.C. Circuit have issued conflicting decisions. *Compare Mia v. Kimberly-Clark Corp.*, No. 1:22-cv-02353 (CJN), 2025 U.S. Dist. LEXIS 42876 (D.D.C. Mar. 10, 2025) (following *Doe* and granting motion to dismiss), *with United States ex rel. Hawkins v. ManTech Int'l Corp.*, No. 15-cv-2015 (ABJ), 2024 U.S. Dist. LEXIS 175317 (D.D.C. Sept. 27, 2024) (rejecting *Doe* and denying motion to dismiss).

framework from *RJR Nabisco*. On appeal after trial, the Fourth Circuit affirmed a civil judgment for the plaintiff, Roe, who was repeatedly raped in Yemen by the defendant's late husband. The evidence established that the defendant and her husband worked at the U.S. embassy, that the plaintiff worked as their housekeeper, and that she lived in their home, which the State Department provided. It further established the husband "continually raped and sexually assaulted" the plaintiff "throughout the duration of her time" with the family, and the defendant was "aware of these assaults" and complicit in them. *Id.*[16]

---

[16] For example, the trial evidence established the following grim facts. When the plaintiff was hired for the "live-in position," the defendant said, "the main part of the job is to make [my husband] happy," and the plaintiff understood that to include doing whatever "was going to make him happy." *Roe*, 917 F.3d at 235. When the plaintiff started work, the defendant gave her a "uniform" that consisted of "a 'very short' skirt and a blouse that 'looked like something you would wear . . . when you go out." *Id.* The defendant saw her husband "touch [the plaintiff]'s rear end and breasts," and he told her about "the rapes." *Id.* On one occasion, he even called the defendant from a doctor's office where he had taken the plaintiff to have a contraceptive device implanted. *See id.* The evidence also established that another housekeeper, Doe, later suffered similar sexual abuse in which the defendant had also been complicit. *See id.* at 246 (holding evidence was admissible under Fed. R. Evid. 404(b)). In her trial testimony, Doe described the defendant's "knowledge and facilitation of [her husband]'s repeated sexual assaults." *Id.*

53

Regarding the extraterritorial application of the TVPA, the Fourth Circuit issued a fractured decision. Considering each statutory provision independently, it held that § 1591, which expressly reaches "conduct committed 'within the special maritime and territorial jurisdiction of the United States,'" applied to the defendant's conduct in Yemen, because "[the defendant]'s part in Roe's abuse occurred entirely" on the U.S. embassy grounds or in government housing, which are special premises that "undoubtedly fall within the 'special maritime and territorial jurisdiction of the United States.'" 18 U.S.C. § 7(9). In contrast, the appeals court held that §§ 1589 and 1590 do *not* "directly refer to foreign conduct" but that since the 2006 amendments to the TVPA, those sections have expressly applied to "extraterritorial acts committed by United States employees," such as the defendant, who worked in the U.S. embassy. *Id.* at 244 (citing 18 U.S.C. § 3271). Meanwhile, the appeals court did not decide whether § 1594, the conspiracy provision, applies to foreign conduct because it was "reasonably certain" that the jury could have awarded the same damages even without that count.

To the extent *Roe* held that some of these substantive provisions of the TVPA applied to the defendant's abusive conduct in Yemen, because

54

the defendant was a U.S. government employee and her conduct occurred on U.S. embassy grounds, its reasoning has no bearing on this case. *See United States ex rel. Fadlalla v. Dyncorp Int'l LLC*, 402 F. Supp. 3d 162, 198-99 (D. Md. 2019) (identifying but not deciding issue regarding extraterritorial application of § 1595 and reading *Roe* to have held that "the remedy provision applied to the claims against the defendant" because she was "a State Department employee who violated the TVPRA overseas") (citing § 3271). Put another way, *Roe* did not hold, or even suggest, that Congress broadly intended to authorize worldwide causes of action for private plaintiffs in factually distinguishable cases like this one, where the alleged foreign conduct occurred in a private home, the defendant was not a U.S. government employee or contractor, and the perpetrator was not even a U.S. national. *See generally Compania de Inversiones Mercantiles S.A. v. Grupo Cementos de Chihuana S.A.B. de C.V.*, 58 F.4th 429, 492 (10th Cir. 2023) ("Comity considerations are at their apex when . . . there is no United States involvement.").[17]

---

[17] Notably, *United States ex rel. Hawkins v. ManTech International Corp.*, which followed *Roe v. Howard* rather than *Doe v. Apple, Inc.*, also involved civil TVPA claims against U.S. employees and contractors, a special class of defendants who are expressly within the statutory scope. *See* 18 U.S.C. § 3271.

Further, and of particular importance here, the Fourth Circuit held that § 1595 provided an extraterritorial private cause of action under the TVPA for violations of §§ 1589, 1590, and 1591, because those "predicates" themselves reached criminal conduct in foreign countries. In reaching that conclusion, the court erroneously focused on the criminal predicates (which expressly reach foreign conduct) rather than the civil remedies (which do not), failed to give sufficient weight to the strong presumption against extraterritoriality, and mistook one possible judicial interpretation of the TVPA for a clear, affirmative indication of congressional intent.

*Roe* also disregarded a core concern of *RJR Nabisco*—that is, the creation of private causes of action for foreign plaintiffs about foreign conduct risks especially sensitive foreign-policy and comity problems. In such cases, "the need to enforce the presumption is at is apex," *RJR Nabisco*, 579 U.S. at 348, and federal courts must tread with particular caution when interpreting federal statutes that do not expressly provide for extraterritorial civil remedies. *See, e.g.*, *Dandong Old North-East Agric. & Animal Husbandry Co. v. Hu*, No. 15-cv-10015, 2017 U.S. Dist. LEXIS 122471, at *36-37 (S.D.N.Y. Aug. 3, 2017) (following *RJR Nabisco*

56

and dismissing RICO claims about alleged injuries in China) ("The *RJR Nabisco* Court premised its decision in substantial part on the risks of 'international friction' associated with allowing [plaintiffs] to 'bypass' potentially 'less generous remedial schemes' available in their home jurisdictions and pursue treble damages for injuries suffered abroad through civil RICO actions in the United States.").

Pavlovich contends that other circuits, including the *en banc* Ninth Circuit, "just last month," endorsed her position about the extraterritorial application of § 1596. Br. 11 (citing *Ratha v. Rubicon Res., LLC*, 168 F.4th 541 (9th Cir. 2025) (*en banc*), and *Adhikari v. Kellogg, Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017)). She is incorrect. *Ratha* did not address the extraterritoriality of the civil-remedy provision. Indeed, the word "extraterritorial" does not appear, even once, in the lengthy *en banc* decision. Rather, *Ratha* held only that the civil-remedies provision imposes liability for "attempted" violations of the TPVA, just like the criminal provisions. That is all the Ninth Circuit meant about provisions being "co-extensive." 168 F.4th at 554. Any suggestion to the contrary is misleading and takes the relevant discussion out of context. Similarly, *Adhikari* did not hold that § 1595

57

applies extraterritorially. The defendants did "not dispute that the 2008 Amendment enables federal courts to entertain a private party's civil suit that alleges extraterritorial violations of the TVPRA." 845 F.3d at 201. Instead, they argued that, assuming the civil-remedies provision is extraterritorial, it is nevertheless not retroactive, and the Fifth Circuit agreed, affirming the dismissal of the plaintiffs' claims.

## CONCLUSION

For the foregoing reasons, Defendant-Appellee Amanda Palmer respectfully requests that this Court affirm the District Court's dismissal of Plaintiff-Appellant Scarlett Pavlovich's complaint.

Respectfully submitted,

**AMANDA PALMER**

By her attorney,

*/s/ Daniel N. Marx*
Daniel N. Marx (#1150876)
Fick & Marx LLP
24 Federal Street, 4th Floor
Boston, MA  02110
(857) 321-8360
dmarx@fickmarx.com

*Counsel for Amanda Palmer*

Dated: July 28, 2026

## CERTIFICATE OF COMPLIANCE

I, Daniel N. Marx, Esq., counsel for Defendant-Appellee Amanda Palmer, certify that this Brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B), because excluding the parts exempted by Fed. R. App. 32(f), it contains 12,366 words and, also, with the type-face and type-style requirements of Fed. R. App. P. 32(a)(5)-(6), because it has been prepared in a proportionally spaced type-face using 14-point Century Schoolbook in Microsoft Word 2016.

/s/ Daniel N. Marx
Daniel N. Marx

## CERTIFICATE OF SERVICE

I, Daniel N. Marx, Esq., counsel for Defendant-Appellee Amanda Palmer, certify that, on July 28, 2026, I caused this Brief to be served electronically through the ECF system on the registered participants as identified on the Notice of Electronic Filing.

*/s/ Daniel N. Marx*
Daniel N. Marx